*United States v. Needham*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: May 22, 2008)                    Decided:  May 14, 2010)

Docket Nos.  06-5652-cr (L), 07-0112-cr (CON), 07-0196-cr (CON), 07-0294-cr (CON)

_____

UNITED STATES OF AMERICA,

*Appellee,*

— v .—

DERRILYN NEEDHAM, JAVIER ROBLES, COREY THOMPSON,

*Defendants-Appellants,*

JOEY FIGUEROA, CHRISTIAN QUINONES,

*Defendants.*

Before: CABRANES, KATZMANN, AND B.D. PARKER, *Circuit Judges.*

_____

Appeal from convictions for Hobbs Act robbery and Hobbs Act conspiracy, challenging jury instructions that robbery of illegal drug proceeds, if proven, satisfied the interstate commerce element of the Hobbs Act as a matter of law. *See* 18 U.S.C. §§ 1951, 1952.   Affirmed in part, reversed and remanded in part.  Cabranes, *J.*, dissenting in part and concurring in part.

_____

Elizabeth E. Macedonio, Bayside, NY, *for Defendant-Appellant Derrilyn Needham.*

1

David L. Lewis, Lewis & Fiore, New York, NY, *for Defendant-Appellant Javier Robles*.

Sanford N. Talkin, Talkin, Muccigrosso & Roberts, LLP, *for Defendant-Appellant Corey Thompson*.

David S. Leibowitz, Assistant United States Attorney, *for* Michael J. Garcia, United States Attorney, Southern District of New York (Katherine Polk Failla, Assistant United States Attorney, *on the brief*), New York, NY, *for Appellee United States of America*.

BARRINGTON D. PARKER, Circuit Judge:

Defendants-appellants Derrilyn Needham, Javier Robles, and Corey Thompson appeal from judgments of conviction in the United States District Court for the Southern District of New York (Lynch, *J.*) for Hobbs Act robbery and related offenses. *See* 18 U.S.C. §§ 1951, 1952. They challenge their convictions based on an instruction that foreclosed the jury's consideration of an essential jurisdictional element of Hobbs Act robbery: whether the robberies, which targeted the proceeds of drug trafficking, affected interstate commerce.

This case presents a situation that is highly unlikely to recur, as it arises from Hobbs Act convictions obtained while the law of this Circuit was in flux. After defendants' trial, our Court held in *United States v. Parkes*, 497 F.3d 220 (2d Cir. 2007), that the jurisdictional element of the Hobbs Act must be found by a jury beyond a reasonable doubt, even where the underlying robbery involved illegal narcotics. Under this supervening rule, the district court's jury instructions were erroneous. But this error affects only those counts of conviction for which we are unable to identify evidence in the record satisfying the interstate element beyond a reasonable doubt. *Cf. Neder v. United States*,

2

527 U.S. 1 (1999). Accordingly, we find that the interstate element was proven with respect to the defendants' conspiracy convictions, which encompassed cocaine and heroin robberies – substances that necessarily originate out-of-state. We cannot conclude the same, however, for the defendants' substantive robbery convictions. These individual robberies involved only the proceeds of marijuana trafficking, a drug that may be grown, processed, and sold entirely within New York. Because the government presented the jury with no evidence that the marijuana robberies at issue here affected interstate commerce in any fashion, these convictions cannot be sustained. Consequently, we vacate defendants' convictions for Hobbs Act robbery, as well as Needham's conviction for attempted Hobbs Act robbery.

The dissent contends, in effect, that every robbery involving marijuana satisfies the Hobbs Act's jurisdictional element as a matter of law. We rejected that proposition in *Parkes* itself.[1] Yet our colleague's reasoning would reinstate this presumption, in the face of clear precedent to the contrary, by effectively putting words in the jury's mouth. In this effort, the dissent draws a false equivalence between Congress's broad power to regulate activities affecting interstate commerce, and the specific jury finding that a particular offense affected interstate commerce, which is required by the Hobbs Act. In so doing, our colleague would turn nearly every robbery into a federal offense. While the dissent concedes that its approach would transform the jury right into a mere "formalism," we believe that the government must prove an effect on interstate commerce, however slight, in every Hobbs Act prosecution. Absent proof beyond a reasonable doubt, this Court cannot substitute its own speculation for the jury finding required by our precedent.

---

[1] *Parkes*, we note, was approved unanimously by the active members of this Court through our "mini en banc" process, because it represented a change in controlling law at the time. *See* 497 F.3d at 230 n.7.

We emphasize that with the law firmly established after *Parkes*, 497 F.3d 220, district courts have clear guidance about how they should instruct juries in Hobbs Act prosecutions going forward, and the situation presented here is unlikely to recur. Nonetheless, in this case the government did not offer any proof that would demonstrate an interstate nexus, however slight or subtle, for the marijuana robberies. As a result, the defendants' robbery convictions must be reversed. The district court's judgments are affirmed in all other respects.[2]

## I.    BACKGROUND

The appellants were prosecuted for their roles in a series of violent robberies targeting narcotics dealers in the New York City area. They belonged to a conspiracy involving approximately ten individuals who, in various combinations, committed more than a dozen robberies and attempted robberies over a two-year period. These robberies ordinarily involved home invasions of suspected drug dealers in which the participants, acting on inside information, gained entry by impersonating police officers and then robbed the inhabitants of drugs and the proceeds of drug sales. In addition to the conspiracy charge, the indictment contained substantive counts charging the appellants for the various roles they played in several of the underlying robberies. Ultimately, the jury convicted the defendants of three of the robberies and conspiracy to commit Hobbs Act robbery. It acquitted the appellants and a fourth defendant, Luis Sanchez, on a variety of additional charges ranging from Hobbs Act robbery to firearms possession.

---

[2] The remaining issues raised on this appeal are resolved in a contemporaneously issued summary order.

4

Defendants Needham and Robles were convicted for a December 13, 2001 robbery at 4434 Baychester Avenue in Bronx, New York. The trial testimony showed that Robles helped to organize the robbery, offering his house as a staging location and supplying four other co-conspirators with guns, police badges, bullet-proof vests, and a police scanner. Needham provided information as to the location of drug proceeds in the house, though she did not participate in the robbery itself. Pretending to be police officers, the crew gained access to the house, subdued the occupants at gunpoint, searched the premises, and ultimately left with a bag containing $600,000 from marijuana sales.

Needham was also convicted of an attempted robbery at 22 Short Street in Mount Vernon, New York, in late 2003. There, she provided information about a marijuana dealer operating out of the location, including details about how to get inside and who to expect there. Two of her counterparts, again equipped with police weapons, badges, and vests, gained entry and handcuffed one of the occupants before searching the apartment. Finding no drugs or money, however, the crew left the scene empty-handed. Importantly, no testimony in the record indicated what amount of drugs or money the robbery crew expected to take from the premises.

Finally, Thompson was convicted of a robbery at 2615 Grand Concourse in Bronx, New York, committed in December 2003. Neither Needham nor Robles were implicated in this robbery, however several other members of the same crew participated and Thompson provided inside information about the marijuana dealing conducted from the targeted address. After knocking at the

door, the four armed men stormed in and questioned a female occupant at gunpoint. Ultimately, they stole $15,000 to $30,000 found in a shoe box in one of the bedrooms.[3] This appeal followed.

## II. DISCUSSION

Offenses under the Hobbs Act require the government to prove, as an element, that a defendant's conduct affected interstate commerce. *See* 18 U.S.C. § 1951; *United States v. Wilkerson*, 361 F.3d 717, 726 (2d Cir. 2004) ("In a Hobbs Act prosecution, proof that commerce was affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference.") (internal quotation marks and alterations omitted). While this interstate effect may be "very slight," it must be proven to the jury beyond a reasonable doubt. *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir. 1981); *see United States v. Parkes*, 497 F.3d 220, 226-27 (2d Cir. 2007). At the time of trial, the law of this circuit presumed that all drug trafficking activity had an effect on interstate commerce sufficient to meet the jurisdictional requirements of the Hobbs Act. *See United States v. Fabian*, 312 F.3d 550, 555 (2d Cir. 2002). Accordingly, the district court instructed the jury, consistent with the law at the time, that:

---

[3] As noted, beyond these offenses, the government presented evidence of nearly a dozen other robberies or attempted robberies in which the defendants were allegedly involved, either directly or as co-conspirators. On appeal, the government argues as though this evidence was fully credited by the jury at trial. This was not the case. While the government obtained convictions on the offenses described above, as well as Hobbs Act conspiracy, the jury acquitted the defendants on a wide range of charges related to these other robberies and firearms possession. In particular, the jury acquitted Robles of three alleged robberies, aiding and abetting firearms possession, and conspiracy to distribute narcotics (Counts 3-5, 8-10, 13). It acquitted Needham of one alleged robbery, aiding and abetting firearms possession, and conspiracy to distribute narcotics (Counts 5, 11, 13). And it acquitted Thompson of weapons possession and conspiracy to distribute narcotics (Counts 12 & 13). A fourth defendant, Luis Sanchez, was acquitted of all charges. These results suggest that the jury had reservations about significant portions of the government's case.

Under the law, all illegal drug activity, even if it is purely local in nature, has an effect on interstate commerce. Therefore, if you find that the object of the robbery at issue was to obtain illegal drugs or money earned from the sale of illegal drugs, this element is satisfied.

The law, however, has since changed. Proof of drug trafficking is no longer regarded as automatically affecting interstate commerce; instead, even in drug cases, the jury must find such an effect as part of its verdict. *See Parkes*, 497 F.3d at 229-30; *United States v. Gomez*, 580 F.3d 94, 100 (2d Cir. 2009). The appellants correctly contend that the jury never had an opportunity to make this crucial jurisdictional finding because of the district court's instructions.

**A.     Standard of Review**

Normally, we would review the failure to charge an element of a crime for harmless error. *See Neder v. United States*, 527 U.S. 1, 9-10 (1999) (applying harmless-error analysis where an element of the offense was withheld from the jury over defendant's objection); *Monsanto v. United States*, 348 F.3d 345, 349-51 (2d Cir. 2003). But where, as in this case, a defendant has failed to timely object, we generally review for plain error. This analysis requires "(1) error, (2) that is plain, and (3) that affects the defendant's substantial rights. If all three conditions are met, we may exercise our discretion to notice the error, provided that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Carter*, 489 F.3d 528, 537 (2d Cir. 2007) (internal citation omitted).

In a further twist, however, we have traditionally applied a "modified" plain error analysis in cases "where, as here, the source of plain error is a supervening decision." *United States v. Henry*, 325 F.3d 93, 100 (2d Cir. 2003) (internal quotation marks omitted). In these instances, the government, not the defendant, "bears the burden to demonstrate that the error . . . was harmless."

7

*Id.* (internal quotation marks omitted). Yet, as a number of panels have noted, it is unclear whether this standard remains in force following the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461, 466 (1997), which applied a plain error standard despite a supervening change in law. Nonetheless, these panels have often found it unnecessary to squarely address the issue, because it did not affect the outcome, and we reach the same conclusion here. *See, e.g.*, *United States v. Lee*, 549 F.3d 84, 89 n.2 (2d Cir. 2008); *United States v. Thomas*, 274 F.3d 655, 668 (2d Cir. 2001). The Court need not resolve this open question because, whether plain error or some modified approach is applied, our conclusions would be the same.

In determining whether error occurred, this Court examines the jury instructions based on "the law existing at the time of the appeal." *See United States v. Ballistrea*, 101 F.3d 827, 835 (2d Cir. 1996). Thus, while the district court's instructions were consistent with the law of this circuit at the time, they are measured here against the current state of our law.

**B.      Analysis**

Since the defendants' trial, we have rejected the view that an interstate effect can be presumed wherever the object of a robbery was to obtain illegal drugs or drug proceeds. Instead, we have held that this element must be found by a jury beyond a reasonable doubt, even where the robbery targets a drug trafficking operation. *See Parkes*, 497 F.3d at 230. More recently, in *United States v. Gomez*, 580 F.3d 94 (2d Cir. 2009), we again recognized that the interstate element of Hobbs Act robbery requires a jury finding, and that this element cannot be presumed in narcotics robberies. *See id.* at 100 (identifying error in instructions' reference to congressional findings, which may have misled the jury into believing that those findings were binding upon it as a trier of fact).

8

In this case, the interstate instruction provided by the district court foreclosed any jury determination on the jurisdictional element. The district court charged the jury, and later repeated in a post-trial order, that if the object of the robbery "was to obtain illegal drugs or money earnings from the sale of illegal drugs," the interstate element was established as a matter of law. Under our intervening decisions in *Parkes* and *Gomez*, this instruction improperly supplanted the required jury finding.

The remaining question, then, is whether this error affected substantial rights. "An error affects a defendant's substantial rights if it is prejudicial and it affected the outcome of the district court proceedings." *United States v. Thomas*, 274 F.3d 665, 668 (2d Cir. 2001) (internal quotation marks omitted). Because the instruction in question involved an element on which federal jurisdiction depends, we conclude that it had the potential to affect the district court proceedings. Without an interstate nexus, the district court would have been deprived of criminal jurisdiction over these offenses altogether. *See United States v. Arena*, 180 F.3d 380, 389 (2d Cir. 1999); *United States v. Leslie*, 103 F.3d 1093, 1103 (2d Cir.1997) ("There is nothing more crucial, yet so strikingly obvious, as the need to prove the jurisdictional element of a crime."). Only this "jurisdictional nexus transforms the quintessential state crimes of robbery and extortion into federal crimes." *United States v. Perrotta*, 313 F.3d 33, 37 (2d Cir. 2002).

The ultimate issue in this case, then, is whether the error was prejudicial. *See Gomez*, 580 F.3d at 102 (concluding that instruction was not prejudicial even if given in error); *cf. Neder v. United States*, 527 U.S. 1, 10 (1999) (applying harmless-error analysis). In *United States v. Jackson*, 196 F.3d 383, 386-87 (2d Cir. 1999), we interpreted the Supreme Court's decision in *Neder*, describing the analysis a reviewing court must undertake to determine whether the omission of an

9

element was harmless. In so doing, we held that "if the evidence supporting the omitted element was controverted, harmless error analysis requires the appellate court to conduct a two-part inquiry, searching the record in order to determine (a) whether there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty." *Jackson*, 196 F.3d at 386. *But see Monsanto v. United States*, 348 F.3d 345, 350 (2d Cir. 2003) (expressing concern that *Jackson* is inconsistent with *Neder*); *United States v. Brown*, 202 F.3d 691, 701 n.19 (4th Cir. 2000) (same). Although we review for prejudice here, a similar analysis is required. *Compare Johnson*, 520 U.S. at 470 *with Neder*, 527 U.S. at 18-19.

In this case, the government offered little or no direct evidence supporting the jurisdictional element – apart from the mere fact that the robberies targeted drug trafficking proceeds. As a result, the defendants had nothing to controvert. In short, neither side presented evidence directly addressing the jurisdictional issue we now consider. But, of course "[i]t is axiomatic that, in a criminal case, the government must prove each and every element of the crime beyond a reasonable doubt." *United States v. Macklin*, 671 F.2d 60, 65 (2d Cir. 1982). Under these circumstances, which include a supervening change in the law, we closely examine the record to determine whether the jury, had it been properly instructed, would have found the jurisdictional element satisfied, or whether the government failed to prove this element beyond a reasonable doubt.

### 1.    Hobbs Act Conspiracy

Because the government proved a single conspiracy encompassing robberies of various drugs and drug proceeds, including cocaine and heroin, we find the interstate element satisfied for each defendant's conspiracy conviction. The indictment charged – and the jury found – a single Hobbs

Act conspiracy in which each of the defendants participated. In support of this charge, the government presented evidence of multiple robberies targeting cocaine and heroin, including one netting eight kilograms of cocaine outside John F. Kennedy International Airport, an attempted robbery at an apartment at 139th Street and Amsterdam Avenue in Manhattan, and two separate attempts at an address on Webb Avenue in the Bronx. Robles himself participated in at least three of these robberies, though neither Needham nor Thompson was directly implicated. Because this evidence suggested the possibility of multiple conspiracies, the district court properly instructed the jury that, in order to convict, it was required to find the single conspiracy alleged in the indictment. The jury did so, crediting the government's allegation that the defendants commonly belonged to a conspiracy to steal drugs and drug proceeds. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance."). Thus, if the overall conspiracy targeted products moving in interstate commerce, as the cocaine and heroin robberies suggest, all three defendants are liable.

To establish the jurisdictional element for Hobbs Act conspiracy, "all that need be shown is the possibility or potential of an effect on interstate commerce, not an actual effect." *United States v. Jones*, 30 F.3d 276, 285 (2d Cir. 1994); *see United States v. Arena*, 180 F.3d 380, 390 (2d Cir. 1999). A conspiracy that targets cocaine and heroin, and the proceeds from their sale, undoubtedly meets this standard. These narcotics cannot be produced in New York, and thus necessarily travel in interstate commerce. Defendants do not suggest otherwise. While the government did not produce any expert testimony on this subject, our Court has held as recently as *Gomez* that a jury is

11

capable of concluding, based on its lay knowledge, that cocaine is imported into the United States. *See* 580 F.3d at 102 (citing *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004)).  We have no reason to take a different view here.  Finding the jurisdictional element satisfied beyond a reasonable doubt, we affirm the defendants' Hobbs Act conspiracy convictions.

## 2. Hobbs Act Robbery and Attempted Robbery

We reach a different conclusion with respect to the defendants' substantive robbery and attempted robbery convictions:  we conclude that the district court's error was prejudicial and thus affected the defendants' substantial rights.  While Hobbs Act jurisdiction must be proven beyond a reasonable doubt, just as any other element, we recognize that the effect on interstate commerce need only be slight or subtle.  *See United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir. 1981); *United States v. Jamison*, 299 F.3d 114, 118 (2d Cir. 2002) ("We have long recognized that the requirement of showing an effect on commerce involves only a minimal burden of proving a connection to interstate commerce, and is satisfied by conduct that affects commerce in any way or degree." (internal quotation marks omitted)).  Nonetheless, the evidence relating to these individual robberies did not meet even this modest threshold beyond a reasonable doubt.

Each of the substantive robberies charged involved only marijuana and the proceeds from its sale.  The robbery at 4434 Baychester Avenue netted approximately $600,000 in marijuana trafficking proceeds, Thompson's robbery at 2615 Grand Concourse brought in $15,000 to $30,000 of the same, and no estimate was ever offered for Needham's attempted robbery at 22 Short Street.

Apart from the simple amount of money obtained, the government offered no evidence to support an interstate nexus for the completed robberies.  It presented no proof that the marijuana sold by the victims had originated out of state, that it was sold to out-of-state customers, that the victims

12

themselves crossed state lines in conducting their business, or that the robbery depleted assets that would have purchased goods in interstate commerce. Similarly, in the case of Needham's attempted robbery, the government offered no proof as to the amount of money she expected to seize on Short Street, the origin of the marijuana, whether customers hailed from out of state, or how the robbery, if successful, might have affected the business enterprise.

Finally, the government did not provide testimony of any kind about marijuana production and trafficking in New York. Yet unlike cocaine or heroin – but like many legal products – marijuana may be grown, processed, and sold entirely within New York. *See Gomez*, 580 F.3d at 102 n.5 (recognizing that marijuana can be grown in-state, whereas cocaine is exclusively foreign in origin); *cf. United States v. Peterson*, 236 F.3d 848, 855 (7th Cir. 2001) (finding that the government failed to demonstrate victim's marijuana trade involved drugs originating out of state and vacating Hobbs Act conviction). Reports documenting the frequency and scale of in-state marijuana production, often implicating tens or hundreds of thousands of dollars, are abundant.[4]

Reviewing for prejudice, we find that the erroneous instruction may very well have affected the outcome of the district court proceedings for each of the defendants' substantive robbery

---

[4] *See, e.g.*, National Drug Intelligence Center, *National Cannabis Cultivation Trends* (2008), http://www.justice.gov/ndic/pubs37/37035/national.htm#Table1 (reporting the seizure of more than 14,000 marijuana plants in New York state in 2008); U.S. Drug Enforcement Administration, *New York Fact Sheet* (2008), http://www.justice.gov/dea/pubs/state_factsheets/newyork.html (noting that while most marijuana is produced out of state, "[i]ndoor marijuana grows are becoming more prevalent in the New York City area. Some of these indoor grows are highly sophisticated and are designed to yield substantial quantities of high potency marijuana."); John Eligon, *Firefighter Accused of Role in Marijuana-Growing Ring*, N.Y. Times, Feb. 26, 2009 (describing 100 marijuana plants discovered growing in a Queens basement, with an estimated value of $500,000); Larry Celona & Andy Geller, *High Times for U.S. Biz*, N.Y. Post, Apr. 13, 2009 (reporting that "[s]ince Oct. 1, [2009,] the Drug Enforcement Administration has broken up eight hydroponic pot-growing set-ups around the state – with five in the Big Apple"); Joseph B. Treaster, *Urban Grow-It-Yourselfers Cash In on Marijuana*, N.Y. Times, Aug. 5, 1994, at B3 (discussing the extensive practice of indoor marijuana growing in New York City).

convictions. On the present record, the government's proof is simply too bare to establish, without more, the required interstate nexus. In Hobbs Act cases, an interstate nexus may be demonstrated where the government introduces evidence that the robbery was of a business (legal or illegal) that (1) serves out-of-state customers, *see United States v. Farrish*, 122 F.3d 146, 149 (2d Cir. 1997) (interstate commerce element proven by evidence that robbed garage, located near interstate portals, "regularly served cars bearing out-of-state license plates," permitting inference that the robberies might discourage out-of-state business); (2) purchases "a commodity that travels in interstate commerce," *see United States v. Jones*, 30 F.3d 276, 285-86 (2d Cir. 1994) (interstate commerce affected by robbery of $9,000 from narcotics buyer, depleting his assets and thereby limiting his ability to make future purchases of cocaine); or (3) purchases goods in-state that originated out-of-state, *see United States v. Wilkerson*, 361 F.3d 717, 730-32 (2d Cir. 2004) (finding Hobbs Act's jurisdictional element satisfied where defendant robbed two men who owned a landscaping company that served only in-state customers and that purchased supplies only from an in-state retailer, because the retailer in turn purchased some of the supplies from out of state); *United States v. Elias*, 285 F.3d 183, 189 (2d Cir. 2002) ("[A] robbery of a local distribution or retail enterprise may be said to affect interstate commerce if the robbery impairs the ability of the local enterprise to acquire – whether from out-of-state or in-state suppliers – goods originating out-of-state."). This is not a high hurdle, and one that the government likely would have met had it introduced evidence regarding the interstate nature of the targeted drug dealers' businesses.

But while an interstate effect may be "subtle" or "slight," it must still be proven to a jury beyond a reasonable doubt. Here, there was no proof whatsoever on the interstate issue. Moreover, the jury's acquittals on a variety of other counts suggest that it had reason to doubt aspects of the

14

government's case. For the Court, as opposed to a jury, to find that the government's limited evidence constitutes proof of interstate effect beyond a reasonable doubt would create an unacceptably broad presumption, one that is inconsistent with the Sixth and Fourteenth Amendments.[5] In essence, it would treat any robbery involving $600,000 or more as a sufficient basis for federal jurisdiction as a matter of law.[6] We recognize, of course, that $600,000 is a substantial sum of money. But the sheer *amount* of money, standing alone, does not demonstrate an interstate effect. Like the other circuits that have considered this type of bright-line rule, we decline to adopt such a presumption. *See United States v. Turner*, 272 F.3d 380, 387-89 (6th Cir. 2001) (holding that the mere fact a robbery targeted illegal gambling proceeds of one to two million dollars did not prove interstate nexus); *United States v. McCormack*, 371 F.3d 22, 28 (1st Cir. 2004), *overturned on other grounds*, 543 U.S. 1098 (2005) ("We decline to adopt any bright-line rule that an extortionate demand of a certain sum from an individual can automatically satisfy the commerce element of the Hobbs Act."). The fact that the robberies here targeted the proceeds of marijuana

---

[5] In one crucial respect, this case is different from the claims reviewed in *Parkes*, where we upheld a Hobbs Act conviction for the attempted robbery of a drug dealer involving $4,000 and a substantial quantity of marijuana. *See* 497 F.3d at 230-31. Unlike this case, the defendants there challenged the sufficiency of the government's evidence, after being convicted by a properly instructed jury. *See id.* at 230. A reviewing court considering the sufficiency of the evidence applies one of the most generous standards available, asking whether "if, drawing all inferences in favor of the prosecution and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Santos*, 449 F.3d 93, 102 (2d Cir. 2006); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Based on the evidence offered at trial, including expert testimony about the predominant sources of marijuana, *Parkes* ultimately credited the jury's finding that the interstate element had been met. *See* 497 F.3d at 230-31. Here, there is no valid jury finding on the interstate element that secures federal jurisdiction, because the jury was not properly instructed; hence, a sufficiency of the evidence standard is inapplicable. Instead, we review for prejudice as described above.

[6] We note that one of the individual robberies at issue, the Grand Concourse robbery, netted only $15,000 to $30,000. The dissent does not address whether that amount would be enough to meet its test, nor even where the critical threshold might be.

15

sales, as opposed to some other product, does not alter this analysis – despite our colleague's views to the contrary.

The dissent argues that we may find federal jurisdiction simply because these robberies involved marijuana. In this view, because the commerce power "encompasses marijuana that is grown, processed, and sold entirely within a single state," neither we nor a jury need look any further. Dissent at 5. Our Court, of course, has rejected this proposition before, in *Parkes* itself, much as it has entertained and discarded the very reasoning that the dissent relies on here. *See Parkes*, 497 F.3d at 229. The dissent's reasoning would effectively reinstate the presumption we jettisoned in *Parkes*, by postulating a rule that produces the same result only using slightly different words.

In particular, the dissent attempts to bootstrap our Hobbs Act jurisprudence to the Supreme Court's interpretation of the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, in *Gonzales v. Raich*, 545 U.S. 1 (2005). Yet, as we have said before, these two statutory schemes are crucially different: the Hobbs Act contains a jurisdictional element, requiring that the government prove an effect on interstate commerce in *every* case, while the CSA does not. *Compare* 18 U.S.C. § 1951(a), *with* 21 U.S.C. §§ 841(a)(1), 844(a). Thus, while *Raich* found that the CSA could be applied to purely intrastate cultivation and sale of marijuana, it considered only Congress's broad power to regulate drug offenses under the Commerce Clause. The Court did not purport to interpret the Hobbs Act, where Congress chose to require proof of an interstate nexus in each individual case. The difference between these two enterprises – Congress's ability to regulate a class of economic activity, versus the specific interstate effects of one transaction or offense – is obvious. As the Supreme Court put it in *Raich*, "[w]e have never required Congress to legislate with scientific exactitude" in

16

order to satisfy the Commerce Clause. *Raich*, 545 U.S. at 17; *see United States v. Nascimento*, 491 F.3d 25, 41-43 (1st Cir. 2007). What matters, instead, is that the overall class of activity has the requisite interstate effects. *See United States v. Morales-de Jesús*, 372 F.3d 6, 18 (1st Cir. 2004). So long as "a general regulatory statute bears a substantial relation to commerce," the fact that individual transactions have a negligible impact on interstate commerce "is of no consequence" in determining Congress's commerce power. *Raich*, 545 U.S. at 17 (internal quotation marks omitted).

Yet Congress has chosen to require exactly this kind of precision in prosecutions under the Hobbs Act. In every case, the government must prove that the alleged offense had some effect on interstate commerce – not simply that the general activity, taken *in toto*, has such an effect. *See* 18 U.S.C. § 1951(a); *Parkes*, 497 F.3d at 230 n.8.[7] The purpose of this requirement is to avoid transforming every robbery and extortion, which are quintessential state crimes, into federal offenses. *See Perrotta*, 313 F.3d at 37. Yet that is precisely what the dissent's rule would accomplish. Its reasoning would extend not only to robberies involving marijuana but *any* product Congress may regulate, legal or illegal, in any amount. Indeed, it is hard to imagine a robbery that would not be a federal crime if the dissent had its way.[8]

---

[7] The dissent relies heavily on our reiteration in *Parkes* that the reach of the Hobbs Act is "coextensive with that of the Commerce Clause of the United States Constitution," 497 F.3d at 230 n.8. Yet our colleague ignores and omits the explanation that immediately followed that statement. As we said there, "this means only that a *de minimis* showing of an effect on interstate commerce is sufficient to satisfy this element; it does *not* obviate the need for some showing." *Id.* (emphasis added). Indeed, *Parkes* itself refused to rest on the mere fact that the robbery in question involved marijuana, looking for a specific effect on interstate commerce notwithstanding the Supreme Court's recent decision in *Raich*. *See Parkes*, 497 F.3d at 231.

[8] Congress, of course, regulates thousands of goods and services pursuant to its commerce power. *Raich*'s holding with respect to marijuana relied directly on a case affirming Congress's authority to regulate homegrown wheat. *See Raich*, 545 U.S. at 17-20; *Wickard v. Filburn*, 317 U.S. 111, 128-29 (1942) (considering the interstate effects of domestic wheat production). Yet by the dissent's logic, if Congress has the authority to regulate a product writ large, then any robbery involving that product

17

The dissent argues that its rule is consistent with our decision in *Parkes* because the jury would still be called upon to make a finding, albeit one with a predetermined result. Our colleague concedes that this approach may seem "formalistic," because the outcome is "virtually certain." Dissent at 11. But the dissent's rule is not a formalism, it is a fiction. In effect, the proposed instructions would tell a jury that all robberies involving narcotics – or anything else Congress has the power to regulate – affect interstate commerce as a matter of law. The jury's finding would not depend on any *facts* demonstrating an effect on interstate commerce. Although the dissent appears to think otherwise, this is precisely what it means to say something is established as a matter of law, and it is precisely the rule we rejected in *Parkes*. To press his point, our colleague goes so far as to publish model jury instructions telling a jury how to resolve a factual issue solidly within its province. Because these instructions misapply *Raich*, substituting its holding for the required factual finding, we do not view them as proper guidance for a jury considering charges under the Hobbs Act.

Marijuana, as noted, may be entirely grown, processed, and sold in-state. Under these circumstances, finding jurisdiction simply because the robberies involved a substance regulated by Congress would effectively undo the jury right recognized in *Parkes*. *See* 497 F.3d at 226-30; *see also Peterson*, 236 F.3d at 855 (vacating Hobbs Act robbery conviction involving marijuana where

---

affects interstate commerce per se, and the jury should be so instructed. A robbery targeting $100 from the sale of wheat, gravel, or prescription drugs would all but automatically meet the Hobbs Act's jurisdictional element, even if the products at issue originated entirely in-state. *See Wickard*, 317 U.S. at 128-29; *D.A.S. Sand & Gravel, Inc. v. Chao*, 386 F.3d 460, 463-64 (2d Cir. 2004) (commerce power extends to regulation of gravel sold entirely intrastate). We have repeatedly said that establishing Hobbs Act jurisdiction requires a "case-by-case inquiry" into a robbery's effects on interstate commerce. *Parkes*, 497 F.3d at 231 n.11. That principle runs directly contrary to the categorical rule that the dissent seeks to import from the Controlled Substances Act. The government would be relieved from proving that the offense actually affected interstate commerce, as the Hobbs Act requires, and could simply gesture toward Congress's power to regulate the overall class of activity at issue. Based on our precedent, we cannot embrace this proposition.

the government failed to adduce any satisfactory proof of an interstate nexus). Although this interstate nexus need be only slight, it cannot be reduced to the point of vanishing altogether, as the government and the dissent would do here.

## IV.    CONCLUSION

For the foregoing reasons, we hereby **REVERSE** Robles's and Needham's convictions for Hobbs Act robbery (Count 2), Thompson's conviction for Hobbs Act robbery (Count 7), and Needham's conviction for Hobbs Act attempted robbery (Count 6), and we **VACATE** the judgments of the district court. The defendants' convictions are **AFFIRMED** in all other respects. We **REMAND** the case to the district court for further proceedings consistent with this opinion.

19

JOSÉ A. CABRANES, *Circuit Judge*, dissenting in part and concurring in part:

Through reasoning that can only be described as remarkable, the majority *vacates* those Hobbs Act convictions in this case that involved *marijuana proceeds* even though it *affirms* those Hobbs Act convictions in this case that involved *cocaine and heroin proceeds*. The basis for this distinction is the majority's claim that "unlike cocaine or heroin . . . marijuana [can] be grown, processed, and sold entirely within New York." Majority Op. 13. From that claim the majority reasons that a properly instructed jury in this case could have concluded that the alleged robberies—netting over $600,000 in marijuana proceeds—did not "affect . . . commerce" and thus did not violate the Hobbs Act. *See* 18 U.S.C. § 1951(a) (applying to "[w]hoever in any way or degree obstructs, delays, or affects commerce . . . by robbery").

To be clear, I agree with the majority that this case involved an erroneous jury instruction. In 2006, then-District Judge Gerard E. Lynch applied the law of our Circuit as it stood at the time and gave the following instruction regarding the "commerce" element of the Hobbs Act, 18 U.S.C. § 1951: "[I]f you find that the object of the robbery at issue was to obtain illegal drugs or money earned from the sale of illegal drugs, this element is satisfied." Robles App. 265-66. I agree with the majority that, following our decisions in *United States v. Parkes*, 497 F.3d 220 (2d Cir. 2007), and *United States v. Gomez*, 580 F.3d 94 (2d Cir. 2009), which changed the law of our Circuit while this appeal was pending, we must now regard Judge Lynch's instruction as error.[1]

Unlike the majority, however, I would not, as result of the error, vacate *any* of the Hobbs Act convictions presented for our review. For each conviction, I have no trouble concluding

---

[1] In *Parkes*, for example, we rejected almost the exact instruction that Judge Lynch gave here, as we held that the district court in that case "properly refused the government's request to instruct the jury that 'if the object of the robbery is to obtain illegal drugs or money earned from the sale of drugs, the requirement of an effect on interstate commerce is satisfied.'" 497 F.3d at 230.

1

"beyond a reasonable doubt that the jury would have returned the guilty verdict even absent the instruction that was given." *Gomez*, 580 F.3d at 102. "For that reason," I would "hold that the error in the jury instruction was harmless." *Id.* Respectfully, therefore, I dissent insofar as the majority vacates the so-called substantive robbery and attempted robbery Hobbs Act convictions (*i.e.*, Counts Two, Six, and Seven).[2]

## I.

I disagree with the majority's reasoning on two grounds. First, I reject the majority's premise that there was any possibility that the jury in this case could have concluded that the robberies at issue involved marijuana that was "grown, processed, and sold entirely within New York." Majority Op. 13. In *Gomez* we faced a similar situation and determined that a "reasonable juror," relying on his or her lay knowledge and common sense, was "surely capable of drawing the conclusion that a robbery undertaken with the object of stealing from a drug dealer three kilos of cocaine . . . would have the required *de minimis* effect on interstate commerce." 580 F.3d at 102. It is no different in this case, where the robberies targeted marijuana. Even if marijuana *can* be grown in New York, the marijuana sold in New York is "almost exclusively" imported from abroad. *Parkes*, 497 F.3d at 231 (quoting an expert witness's testimony).[3] Thus it would take nothing short of divine intervention for a robbery involving hundreds of thousands of dollars of marijuana proceeds to fail to recover at least *some* money derived from the interstate or foreign drug trade. I am confident, moreover, that jurors could—and without question *would*—reach that conclusion based on their lay knowledge and

---

[2] I concur in the remainder of the majority's opinion.

[3] I acknowledge, of course, that there was no expert witness testimony in this case. Nonetheless, I think that a reasonable juror can be expected to know, based on his or her lay knowledge and common sense, *see Gomez*, 580 F.3d at 102, that the overwhelming majority of all illegal drugs in New York—including marijuana—comes from out-of-state.

2

common sense.  *Gomez*, 580 F.3d at 102.  Thus I reject the majority's premise that a reasonable jury could have concluded that the robberies in this case involved proceeds from exclusively "homegrown" marijuana.

Second, I disagree with the majority's conclusion even accepting its premise, for I am confident that a properly instructed jury in this case would have found the required effect on commerce *even if the jury had assumed that the marijuana in question was "grown, processed, and sold entirely within New York."*  Majority Op. 13 (emphasis added).  To understand my view, one must examine our Hobbs Act jurisprudence and consider exactly what the jury, "had it been properly instructed," Majority Op. 10, would have been told about the "commerce" element of the Hobbs Act.

The Hobbs Act provides as follows:

> Whoever *in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce*, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (emphasis added).  The Act contains an expansive definition of "commerce":

> The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and *all other commerce over which the United States has jurisdiction.*

*Id.* § 1951(b)(3) (emphasis added).

A properly instructed jury, therefore, would be told that, to convict on a Hobbs Act robbery count, it must find that the robbery in question had an effect on "commerce over which the United States has jurisdiction."  18 U.S.C. § 1951(a)-(b).  Under *Parkes* and *Gomez*, the jury would be told

3

that it is required to make an "independent finding" about whether there was an effect on commerce; the jury would *not* be told that an effect on commerce is automatically established if the jury finds that the robberies targeted drug proceeds.

To explain the meaning of "[e]ffect," the jury would be told, under our precedents, that "only 'a very slight effect on interstate commerce' need be shown." *Gomez*, 580 F.3d at 101 (quoting *United States v. Wilkerson*, 361 F.3d 717, 726 (2d Cir. 2004)); *accord Parkes*, 497 F.3d at 230 ("[T]he required showing of an effect on interstate commerce is *de minimis*."). The jury would also be instructed that, in order to convict, it need not find an *actual* effect on commerce, for "'[e]ven a *potential* . . . effect on commerce will suffice.'" *Gomez*, 580 F.3d at 101 (emphasis added) (quoting *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir. 1981)). Finally, the jury would be told that the government can establish the required "effect" through any kind of proof—not only could direct or indirect evidence be used to establish an effect on commerce, but "'circumstantial evidence could [also] suffice.'" *Id.* (quoting *Parkes*, 497 F.3d at 231 n.11).

To explain the meaning of "commerce," the presiding judge would be mindful that we have repeatedly held that the Hobbs Act's definition of "commerce" is "coextensive with *the full reach of Congressional power over commerce*." *Id.* (emphasis added); *see also* 18 U.S.C. § 1951(b) (defining "commerce" to include "all . . . commerce over which the United States has jurisdiction"); *Parkes*, 497 F.3d at 230 n.8 ("[T]he reach of the Hobbs Act is 'coextensive with that of the Commerce Clause of the United States Constitution.'" (quoting *United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002)). If it is appropriate, therefore, and if it is requested by one of the parties, the presiding judge could explain to the jury some of the basic concepts of Congress's authority under the Commerce Clause.

4

That would be particularly apt in a case like this one, where, following *Parkes* and *Gomez*, the jury is required to make an independent finding about whether a robbery targeting marijuana proceeds affects "commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(a)-(b). Indeed, the law regarding Congress's authority under the Commerce Clause is particularly well settled—and easy to explain to a jury—with respect to commerce involving marijuana, as the Supreme Court has held that Congress's authority to regulate marijuana under the Commerce Clause is virtually unlimited. *See Gonzales v. Raich*, 545 U.S. 1 (2005). Of particular relevance to this case, a properly instructed jury would be told that "commerce" for purposes of the Hobbs Act—that is, "commerce over which the United States has jurisdiction," 18 U.S.C. § 1951(b)—encompasses marijuana that is grown, processed, and sold entirely within a single state. *See Raich*, 545 U.S. at 5, 22 (holding that "the scope of Congress' authority under the Commerce Clause" includes "the power to prohibit the local cultivation and use of marijuana").

I recognize, of course, that *Raich* addressed the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, which differs from the Hobbs Act in that it does not contain a jurisdictional "commerce" element to be found by the jury. That does not mean, however, that *Raich* has no bearing on the definition of "commerce" in the Hobbs Act. *See* Majority Op. 16. To the contrary, as I note above, we have repeatedly held that "the reach of the Hobbs Act is 'coextensive with that of the Commerce Clause of the United States Constitution.'" *Parkes*, 497 F.3d at 230 n.8 (quoting *Elias*, 285 F.3d at 188).[4] Therefore, all decisions that delineate the scope of the Commerce Clause

---

[4] Furthermore, I am not attempting to draw an "equivalence" between "Congress's broad power to regulate activities affecting interstate commerce" and "the specific jury finding that a particular offense affected interstate commerce, which is required by the Hobbs Act." Majority Op. 3. Rather, I am arguing that a properly instructed jury would be told that "commerce" as defined in the Hobbs Act includes purely *intra*-state marijuana sales. It would then be up to the jury to decide whether to make the "specific jury finding that a particular offense affected interstate commerce." *Id.*

5

also delineate the scope of the Hobbs Act. *Raich*, in particular, explains that Congress's authority under the Commerce Clause includes the power to regulate marijuana that is grown, processed, and sold entirely within a single state. Accordingly, the term "commerce" in the Hobbs Act—whose "reach" is "coextensive" with the Commerce Clause, *Parkes*, 497 F.3d at 230 n.8—includes purely "homegrown" marijuana.

In sum, under *Parkes* and *Gomez*, a properly instructed jury in this case would *not* have been told, as the jury was erroneously told here, that "if [it] found that the object of the robbery at issue was to obtain illegal drugs or money earnings from the sale of illegal drugs, [the 'commerce'] element is satisfied." Robles App. 265-66. Instead, the government could have requested—and Judge Lynch could and should have given—additional jury instructions that painted a fuller picture of the law regarding the Hobbs Act "commerce" element. Thus Judge Lynch would have told the jury, among other things, the following:

> (1) In order to convict on a substantive Hobbs Act robbery count, you, the jury, must make an independent finding that the robberies at issue had an "effect" on "commerce." 18 U.S.C. § 1951(a); *Gomez*, 580 F.3d at 100; *Parkes*, 497 F.3d at 230.

> (2) The required "effect" on commerce need only be "very slight" and can be "potential" rather than actual. *Gomez*, 580 F.3d at 101; *Parkes*, 497 F.3d at 230.

> (3) "Commerce" for these purposes includes "all . . . commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b).

> (4) The United States' jurisdiction over commerce encompasses marijuana that is grown, processed, and sold entirely within a single state. *Raich*, 545 U.S. at 5, 22.[5]

---

[5] In fact, the District Court gave an instruction to the jury that was similar to this. *See* Robles App. 265. The District Court erred only when it further stated that "if [the jury] found that

6

If the jury in this case had been given those instructions[6]—which are, after all, no more than a summary of well established law—I have no doubt that it would have found that the robberies alleged in Counts Two, Six, and Seven had the required effect on commerce. That is, contrary to the majority's analysis, I am confident that the jury would have found an effect on commerce simply by virtue of the fact that each of the robberies targeted the proceeds of marijuana sales.

Even accepting the majority's premise that the marijuana at issue could have been "grown, processed, and sold entirely within New York," Majority Op. 13, "the local cultivation and use of marijuana" falls within "the scope of Congress' authority under the Commerce Clause," *Raich*, 545 U.S. at 5, 22, and thus qualifies as "commerce" for purposes of the Hobbs Act, *Parkes*, 497 F.3d at 230 n.8 ("[T]he reach of the Hobbs Act is coextensive with that of the Commerce Clause of the United States Constitution." (internal quotation marks omitted)). If the jury had been properly

---

the object of the robbery at issue was to obtain illegal drugs or money earnings from the sale of illegal drugs, [the 'commerce'] element is satisfied." *Id.* 265-66.

[6] The majority chides me for "publish[ing] model jury instructions telling a jury how to resolve a factual issue solidly within its province." Majority Op. 18. Yet as I discuss in Part II below, the "commerce" element of the Hobbs Act is a so-called "mixed question of law and fact" with respect to which the "judge must be permitted to instruct the jury on the law and to insist that the jury follow his instructions." *United States v. Gaudin*, 515 U.S. 506, 513 (1995). Surely the majority is not claiming that the judge should *decline* to instruct the jury on the law.

But which of my "model jury instructions" is *not* the law? It is the law that (1) the jury must make an independent finding of "commerce" and that (2) the required "effect" on commerce need only be "very slight" or "potential." *Gomez*, 580 F.3d at 100-01. It is also the law that (3) "commerce" includes "all . . . commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b); *see also Gomez*, 580 F.3d at 101 (holding that the Hobbs Act's definition of "commerce" is "coextensive with *the full reach of Congressional power over commerce*" (emphasis added)). And it is the law that (4) "the scope of Congress' authority under the Commerce Clause" (*i.e.*, the "commerce over which the United States has jurisdiction") includes "the power to prohibit the local cultivation and use of marijuana." *Raich*, 545 U.S. at 5, 22. I do not understand why the majority thinks that those established legal principles should be kept from the jury.

instructed about that law, there can be no question that it would have found the "commerce" element satisfied, even if it had determined that the marijuana in question was exclusively homegrown.

Accordingly, I have no trouble concluding "beyond a reasonable doubt that the jury would have returned the guilty verdict even absent the instruction that was given." *Gomez*, 580 F.3d at 102. "For that reason," I would "hold that the error in the jury instruction was harmless," *id.*, and I would affirm the convictions on Counts Two, Six, and Seven.[7]

## II.

I hasten to add that I am not arguing that our Court should overturn *Parkes* or *Gomez*, for I do not think that we should "dispense with the need for a jury finding that each element of the Hobbs Act has been proven beyond a reasonable doubt." *Parkes*, 497 F.3d at 229. Rather, I agree

---

[7] The majority worries that if my understanding of the law were correct, a "robbery targeting $100 from the sale of wheat, gravel, or prescription drugs would all but automatically meet the Hobbs Act's jurisdictional element, even if the products at issue originated entirely in-state." Majority Op. 17 n.7. If that result is troubling, I submit that it is caused by the plain language of a statute with an exceedingly broad scope. *See* 18 U.S.C. § 1951(a)-(b) (extending the Hobbs Act to "[w]hoever *in any way or degree* . . . affects commerce . . . by robbery" and defining "commerce" as "*all . . . commerce over which the United States has jurisdiction*" (emphasis added)); *see also Parkes*, 497 F.3d at 230.

In any event, I am not arguing that "a robbery targeting $100 from the sale of wheat, gravel, or prescription drugs would all but *automatically* meet the Hobbs Act's jurisdictional requirement." Majority Op. 17 n.7 (emphasis added). I am arguing that, if a jury were properly instructed about Congress's authority to regulate even a certain type of *intra*-state commerce, then we could be confident that the jury would make the required "independent finding" of "commerce" simply by virtue of the fact that the robbery targeted this type of commerce.

It is, furthermore, highly improbable that a federal prosecutor would ever bring a Hobbs Act prosecution based on a robbery of $100 in gravel proceeds. The majority does not seem to understand that, given the extremely low showing required to demonstrate "commerce" for purposes of the Hobbs Act (even under the majority's constrained reading of our case law), it is mainly *the discretion of federal prosecutors* (and a lack of federal resources) that prevents countless petty robberies from being prosecuted as federal crimes.

8

with *Parkes* and *Gomez* that a jury in a Hobbs Act prosecution must make an independent finding of an effect on commerce. My point is only that the jury would almost certainly make such a finding *even if it determined that the marijuana in question had been grown, processed, and sold in a single state.*

Again, following *Parkes* and *Gomez*, a jury will no longer be instructed that the "commerce" element of the Hobbs Act is automatically satisfied if the jury finds that the robberies at issue targeted drugs or drug proceeds. Absent that instruction, however, it will become necessary for the jury to have a fuller account of the meaning of "commerce" under the Hobbs Act. In this case, for example, because the government had introduced no evidence that the marijuana at issue had traveled outside New York, the government could have requested—and Judge Lynch should have given—an instruction explaining that the "commerce over which the United states has jurisdiction," 18 U.S.C. § 1951(b), encompasses "the local cultivation and use of marijuana," *Raich*, 545 U.S. at 5.[8] If that fuller account of "commerce" had been given to the jury, I have no trouble concluding that the jury would have found the "commerce" element satisfied, even if the jury determined that the marijuana in question had been grown, processed, and sold solely in New York.

I acknowledge, furthermore, that my reasoning does imply that in cases like this one—where there was an erroneous jury instruction of the type identified in *Parkes* and *Gomez*—the erroneous instruction will almost always be found to be harmless error. But I do not think that this result is inconsistent with *Parkes* or *Gomez*. The central holding of *Parkes* and *Gomez* is that juries should *not* be instructed that the "commerce" element is automatically established if the alleged robberies targeted drugs. That holding remains intact even if the erroneous instruction will be found to be

---

[8] Of course, as it happened, the government did not request such an instruction, and Judge Lynch did not give such an instruction. But this is only because, under the law of the Circuit at the time, such an instruction would have been superfluous in light of the now-erroneous instruction that told the jury that the "commerce" element was automatically satisfied by a finding that the robberies targeted drug proceeds.

harmless in the vast majority of cases, and I am confident that district judges will follow *Parkes* and *Gomez* even if it is unlikely that a *Parkes*-type error would ever lead to a conviction being vacated on appeal.

Moreover, nothing in *Parkes* or *Gomez* is inconsistent with the idea that the erroneous instruction identified in those cases will be found to be harmless in nearly all cases. *Parkes*, after all, suggested in *dicta* that "a rational jury *could* conclude that the interstate commerce element is satisfied by proof that a robbery targeted drugs or proceeds of a drug business that is *purely intrastate*."[9] *Parkes*, 497 F.3d at 231 n.10. *Gomez*, moreover, concluded that "even the commercial effect of home-grown drugs . . . has been described by the Supreme Court as 'visible to the naked eye,' such that we would infer an effect on interstate commerce *from purely domestic production*." 580 F.3d at 102 (emphasis added) (quoting *Raich*, 545 U.S. at 28-29). And even under the majority's reasoning, we would find harmless error in *all* Hobbs Act cases involving cocaine or heroin, as the majority reasons that those drugs *must*, by their nature, travel in interstate commerce. Majority Op. 11.

Finally, I recognize that my reasoning makes the jury's independent finding of commerce seem formalistic. Under *Parkes* and *Gomez*, the jury may *not* be told that the "commerce" element is automatically established if the robberies at issue involved illegal drugs. But under my reasoning, after the jury is told to make an independent finding on the "commerce" element, the jury should also be instructed on the law of "commerce," including that the United States' jurisdiction over commerce encompasses marijuana that is grown, processed, and sold solely within a single state.

---

[9] Given the fact that the robberies in this case netted (or attempted to net) huge sums of money, finding the required effect on commerce was more than just one among equally weighted inferences that the jury "*could*" make. *See Parkes*, 497 F.3d at 231 n.10. Rather, to restate the point, I have no doubt that a properly instructed jury in this case *would* have inferred the required effect on interstate commerce, even if the jury assumed that the robberies targeted "proceeds of a drug business that is *purely intrastate*." *Id.*

Those additional instructions on the law of "commerce" make the jury's independent finding appear to be a formalism, as the instructions make it virtually certain that a rational jury will find the "commerce" element established in every Hobbs Act case involving drugs.

But insofar as my reasoning makes the jury's independent finding of commerce somewhat formalistic, such formalism is no more than a familiar and long-established feature of our jury system. *Parkes* changed the law of our Circuit in part because the Supreme Court's decision in *United States v. Gaudin*, 515 U.S. 506 (1995), "undid Second Circuit precedent that treated the interstate commerce element of the Hobbs Act as a matter of law for the judge." *Parkes*, 497 F.3d at 227. *Gaudin* held that the jury—not the judge—is required to make a finding on each element of a crime, including those elements, like the "commerce" element of the Hobbs Act, that involve a "'mixed question of law and fact.'" 515 U.S. at 512. Nothing in *Gaudin*, however, implied that the judge should not instruct the jury on the law. Indeed, *Gaudin* repeatedly emphasized that, for mixed questions of law and fact, "the judge must be permitted to instruct the jury on the law and to insist that the jury follow his instructions." *Id.* at 513; *see also id.* at 514 (taking guidance from "the 1807 treason trial of Aaron Burr in which Chief Justice Marshall charged the jury that 'levying war is an act *compounded of law and fact*; of which the jury, aided by the court[,] must judge[,] . . . [and] hav[ing] now heard the opinion of the court on the *law* of the case[,] [t]hey *will apply that law to the facts*, and will find a verdict of guilty or not guilty as their own consciences may direct'" (some quotation marks omitted; most alterations and emphasis in original)).

A jury's independent finding, therefore, appears formalistic in cases like this, where one element of a crime is a mixed question of law and fact, and the law that the judge must explain to the jury makes it virtually certain that the jury—if it follows the law—will find the element satisfied, given a certain factual predicate. Here, for instance, the "commerce" element of the Hobbs Act is a

11

mixed question of law and fact, and the law that the judge must explain to the jury makes it virtually certain that the jury will find the "commerce" element satisfied, given a finding that the robberies in question involved drugs. That does not mean, of course, that the judge may take the required finding away from the jury, for criminal defendants in our system have a "historical and constitutionally guaranteed right . . . to demand that the jury decide guilt or innocence on every issue." *Id.* at 513. But it also does not mean that the judge should refrain from fully instructing the jury about the law.

Thus, in future Hobbs Act cases, the jury may *not* be told that the "commerce" element is *automatically established* if the robberies at issue targeted drugs. That would infringe on a defendant's right to have the jury "decide guilt or innocence" with respect to the "commerce" element. But the jury can and should be fully instructed about the law of "commerce," and thus the jury can and should be told that the United States' jurisdiction over commerce, 18 U.S.C. § 1951(b), encompasses marijuana that is grown, processed, and sold entirely within a single state, *Raich*, 545 U.S. at 5, 22.

To summarize: If the jury in this case had been properly instructed regarding the law of the "commerce" element of the Hobbs Act, I have no doubt that it would have found the "commerce" element satisfied, even if it assumed that the marijuana in question was exclusively homegrown. The erroneous instruction, therefore, was harmless, and we should affirm the substantive robbery and attempted robbery Hobbs Act convictions (*i.e.*, Counts Two, Six, and Seven).

For those reasons, I respectfully dissent.

12