**UNITED STATES of America,**
**Appellee,**

v.

**Alex ELIAS, also known as Puff,**
**Defendant–Appellant,**

**Luis Otero, also known as**
**Gardana, Defendant.**

**Docket No. 01–1176.**

United States Court of Appeals,
Second Circuit.

Argued: Nov. 26, 2001.

Decided: March 25, 2002.

Colleen P. Cassidy, The Legal Aid Society, Federal Defender Division, New York, NY, for Appellant.

Susan Corkery, Assistant United States Attorney for the Eastern District of New York, New York, NY (Alan Vinegrad, United States Attorney, and Peter A. Norling, Assistant United States Attorney, on the brief), for Appellee.

Before: JACOBS, SACK, KATZMANN, Circuit Judges.

JACOBS, Circuit Judge.

Defendant Alex Elias appeals from a judgment entered in the United States District Court for the Eastern District of New York (Ross, *J.*), convicting him, after a jury trial, of robbery and conspiracy to commit robbery, in violation of 18 U.S.C. § 1951 (the "Hobbs Act"). Elias argues (1) that the trial evidence was insufficient to establish the jurisdictional element of the Hobbs Act conviction because the government failed to prove the requisite effect on interstate commerce and (2) that improper remarks made by the prosecutor during rebuttal summation were prejudicial.[1]

As to the jurisdictional predicate, there is evidence of an impact on interstate commerce, and although it is thin, it does not fail the *de minimis* test that applies to the question. As to the prosecutor's remarks, the prosecutor referenced a point made in summation by the defense—that the victim of the assault, who could not identify the assailant, was no witness—and characterized it as an "insult" to the victim and a sign of "desperation" on the part of the defense. While these remarks grossly misrepresented the point urged in the defense summation, and were calculated to inflame the jury, we conclude that no retrial is justified because (1) the remarks were an aberration in an otherwise fair proceeding; (2) the defense summation included comments on the same witness that could fairly have provoked the prosecutor's "insult" comment; (3) some steps were taken to mitigate any impact of the remarks cited by the defendant; and (4) conviction was certain even in the absence of the claimed misconduct.

## BACKGROUND

The prosecution arose out of an October 24, 1998, robbery of a neighborhood grocery store in Queens, New York, the Aybar Grocery. The government undertook to show at trial that the stick-up affected interstate commerce because the grocery store sold beer brewed in Mexico and the Dominican Republic and fruit grown in

---

1. For issue presentation purposes, Elias also conscientiously renews his contention that, under the reasoning of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the career offender provisions of the United States Sentencing Guidelines should not have been used to enhance his sentence unless those provisions were charged in the indictment and submitted to the jury for findings beyond a reasonable doubt. As Elias concedes, this challenge is foreclosed by Circuit precedent. *See United States v. Latorre–Benavides*, 241 F.3d 262, 264 (2d Cir.2001) (per curiam).

Florida and California. Construing the evidence in the light most favorable to the government, *see United States v. Mapp,* 170 F.3d 328, 331 (2d Cir.1999), the evidence presented at trial was as follows.

Juan Mora, employed at Aybar Grocery, was preparing to close for the night when, at around 11:00 p.m., a masked gunman grabbed him by the neck, spun him around, and threw him face down on the floor. Also ordered down was José Batista, a friend of the store's owner. The gunman then struck Mora with the gun while demanding Mora's keys and asking where the money was kept.

Mora kept his eyes closed throughout the robbery and never saw the robbers' faces, but he heard them talking in Spanish. The robbers took approximately $1400 in cash, along with cigarettes, MetroCards, calling cards, and food stamps.

A 911 call alerted police that two Hispanic men were fleeing a robbery in progress and gave the make, color, and New York license plate number of their car. Soon after receiving a radio transmission on the robbery, Officer David Rodriguez spotted the getaway car at a red light, and pulled his patrol car head-on with it. As Rodriguez's partner got out to investigate, the getaway car sped off around the patrol car. Rodriguez attempted to pursue but stopped when his partner was grazed by the open door of the patrol car. Rodriguez broadcast the direction of the getaway car and soon resumed pursuit. Within a few minutes, he spotted the car abandoned near a housing project. Retrieved from the car were a hat and one glove, as well as items matching those stolen from Aybar Grocery.

The police began a search for the suspects, who were described as wearing leather jackets. Officer Rafael Correa spotted two Hispanic men in T-shirts leaving the housing project and heading in the direction of a nearby grocery. Correa's suspicion was aroused because the men were without jackets on a chilly night. He and his partner approached the coatless men as they reached the store; one of them, Elias, gave his name and explained that he was out of breath because he had come from a party in a building in which the elevators were out of order.

Officer Rodriguez arrived and identified Elias as the man whose face he had seen behind the wheel when the cars were stopped head-on. He could not identify the other person. Elias was arrested. A leather jacket was later found discarded near the grocery store with one glove in the pocket.

At trial, the government called a jailhouse informant to testify pursuant to a cooperation agreement. The informant had a prodigious criminal record—including numerous armed robberies, several carjackings and attempted murders, and two arsons—and once gave perjured testimony in an attempted murder trial. According to the informant, Elias admitted committing the robbery with his cousin and recounted details such as the events of the chase, the glove left behind in the car, and the discarding of the leather jacket. When Elias's cousin was arrested, Elias introduced him to the informant as his partner in the robbery.

The government relied at trial chiefly on Officer Rodriguez's identification, the informant's testimony, and a fingerprint of Elias's cousin (lifted from a bag in the getaway car). According to a forensic expert, the gloves yielded insufficient DNA for testing; the leather jacket yielded DNA, but not of Elias or his cousin; and the hat yielded DNA from more than one person, but the test results did not point to Elias or exclude him. The expert testified,

however, that a hat or jacket may not yield DNA of the wearer.

The defense summation, consistent with the defense theory of mistaken identity, emphasized that Mora had his eyes closed and could not see the robbers, who in any event were masked:

What's notable about this case is that there is no eyewitness to the robbers. There were eyewitnesses to the robbery, so to speak. *Nobody is denying that a robbery took place. But there was no witness in the store who saw the robbers.* ...

Juan Mora witnessed the event but never saw the robbers. In terms of considering the testimony that Mr. Mora gave, I think that you have to evaluate it in terms of what his observations were and what his memory of the event was. In terms of his observations he told you, *he saw nothing.* He kept his eyes closed for most of the event. He didn't even see—he certainly didn't see the faces, didn't even see the body types of the robbers. He said that his eyes were always closed.

Now, we all have sympathy for what Mr. Mora went through.... But the issue which you have to address is what information did he provide you that assists you in determining who committed this crime? He certainly doesn't provide any information about who the robbers were. All he saw was a mask.

(Emphases added.) In her rebuttal summation, the prosecutor characterized the foregoing defense argument as an insult to the victim and a tactic of desperation:

To say that Juan Mora was not a witness to this robbery, a man who was pistol whipped by the defendant and his coconspirator ..., is an insult.

To say that the man who was terrorized, but couldn't see the faces because the perpetrators were wearing masks, is

not a witness to the crime, shows how desperate the defendant is.

The prosecutor went on to rebut point by point other alleged weaknesses in the proof against Elias.

Citing the prosecutor's rebuttal summation, the defense moved unsuccessfully for a mistrial.

## DISCUSSION

### A. *Interstate Commerce*

Elias argues that the evidence was insufficient to establish the jurisdictional element of the Hobbs Act conviction because the government failed to prove the requisite effect on interstate commerce. Heavy as a defendant's burden is on such an appeal, *see United States v. Leslie,* 103 F.3d 1093, 1100–01 (2d Cir.1997), Elias is assisted somewhat by the decision to prosecute as a federal offense the stick-up of a neighborhood grocery store.

The Hobbs Act, insofar as pertinent here, states:

(a) Whoever *in any way or degree* obstructs, delays, or *affects commerce* or the movement of any article or commodity in commerce, *by robbery* or extortion or attempts or conspires so to do, *or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section* shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section—

\* \* \* \* \* \*

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; *all commerce between any point in a State,*

*Territory, Possession, or the District of Columbia and any point outside thereof;* all commerce between points within the same State through any place outside such State; and *all other commerce over which the United States has jurisdiction.*

18 U.S.C. § 1951 (emphases added).

 In a Hobbs Act prosecution, proof that "commerce [wa]s affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). "There is nothing more crucial, yet so strikingly obvious, as the need to prove the jurisdictional element of a crime." *Leslie,* 103 F.3d at 1103. At the same time, it is well established that the burden of proving a nexus to interstate commerce is minimal. *See United States v. Shareef,* 190 F.3d 71, 75 (2d Cir.1999). "The jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect on commerce will suffice." *United States v. Angelilli,* 660 F.2d 23, 35 (2d Cir.1981) (internal citations omitted); *accord Jund v. Town of Hempstead,* 941 F.2d 1271, 1285 (2d Cir.1991) ("If the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under the Hobbs Act.").

The reach of the Hobbs Act has been held to be coextensive with that of the Commerce Clause of the United States Constitution. *See Stirone,* 361 U.S. at 215, 80 S.Ct. 270; *Leslie,* 103 F.3d at 1101 ("The statute's requirement that the questioned activity 'affect commerce' in 'any way or degree' signals Congress's desire to exercise the full extent of its Commerce

Clause power."). Even after *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), this Court (along with other Circuits) has continued to hold that the Hobbs Act requires no more than a *de minimis* impact on interstate commerce. Our reasoning has been that the Hobbs Act "regulates activities which, in the aggregate, have a substantial effect on interstate commerce; hence, the '*de minimis* character of individual instances arising under [the] statute is of no consequence.'" *Leslie,* 103 F.3d at 1100 (quoting *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624) (alteration in original); *accord United States v. Farrish,* 122 F.3d 146, 148 (2d Cir.1997) ("We now expressly hold that *Lopez* did not raise the jurisdictional hurdle for bringing a Hobbs Act prosecution.").

 Elias concedes that under Second Circuit law the requisite effect on interstate commerce need be no more than *de minimis;* even so, he argues, the government failed to demonstrate that the Aybar Grocery engaged in interstate transactions, purchased goods from out-of-state suppliers, or served out-of-state customers. The sole evidence offered to show an effect on interstate commerce was that the Aybar Grocery sold beer produced outside the United States and fruit grown outside New York. According to Elias, the fact that "the Aybar Grocery may have purchased some items that had been originally produced out of state or that had at one time traveled interstate is not itself sufficient to establish that a robbery there affected interstate commerce, without any evidence that Mr. Aybar bought anything from out of state suppliers." We do not agree that the jurisdictional nexus fails absent evidence that some of the products sold at Aybar Grocery were purchased direct from out-of-state suppliers.

■ The jurisdictional element of a Hobbs Act violation may be satisfied by evidence demonstrating an indirect effect on interstate commerce. *See United States v. Jones*, 30 F.3d 276, 285 (2d Cir. 1994) (holding that an effect on commerce is sufficient "even though the effect is not immediate or direct or significant, but instead is postponed, indirect and slight"). The jurisdictional nexus was held sufficient in *Jones*, in which a New York undercover police officer in a "buy and bust" operation was robbed by the drug-dealer suspects. Under a "depletion-of-assets" theory, we reasoned that the loss of the stolen funds limited the amount of cocaine the officer would be able to purchase in the future, and that cocaine is a commodity that "came from outside of New York and would qualify as moving in interstate commerce." *Id.* at 285. The *Jones* opinion did not say expressly whether the government had to show that the officer intended to make a future cocaine purchase from an out-of-state supplier; but it is clear enough that the transactions deemed affected by the depletion of the officer's assets were buy-and-bust transactions conducted on local streets within the police department's municipal jurisdiction—such as the in-state cocaine purchase he was engaged in when he was robbed.

■ By analogy to *Jones*, it is sufficient here that the beer and fruit Aybar purchased from in-state suppliers originated out-of-state. The beer and fruit still "came from outside of New York and would qualify as moving in interstate commerce." *Id.* In short, a robbery of a local distribution or retail enterprise may be said to affect interstate commerce if the robbery impairs the ability of the local

enterprise to acquire—whether from out-of-state or in-state suppliers—goods originating out-of-state. *See United States v. Mapp*, 170 F.3d 328, 336 n. 13 (2d Cir. 1999) (finding a sufficient jurisdictional nexus for the robbery of a delicatessen that sold goods produced out-of-state, without mentioning whether the goods were purchased from out-of-state suppliers).

Further support for this position comes from the Sixth Circuit, which has expressly considered, and rejected, the very argument that Elias raises here. In *United States v. Brown*, 959 F.2d 63 (6th Cir. 1992), the defendant attempted to rob a nightclub that served beer and snack food manufactured out-of-state but purchased from an in-state distributor. The jurisdictional nexus was deemed sufficient because depletion of the nightclub's assets would have affected the amount of its purchases from the in-state distributor, which, in turn, would have impeded the flow of such items in interstate commerce. *Id.* at 68.

In light of our holding in *Jones* that the effect on interstate commerce need not be direct, we accept the reasoning of the Sixth Circuit in *Brown*. In terms of the *Brown* analysis, the Aybar robbery depleted assets that might have been utilized to purchase out-of-state goods. In other terms, the Aybar Grocery furnished an outlet for goods that move in interstate commerce, and the robbery impaired its financial capacity to draw goods from interstate origins for local resale. Since the evidence at trial established that the Aybar Grocery stocked goods originating out-of-state, the requisite indirect, minimal effect on interstate commerce was thereby sufficiently established.[2]

---

2. Elias relies on two cases: *Leslie*, 103 F.3d 1093; and *United States v. Pinckney*, 85 F.3d 4 (2d Cir.1996). In those cases, the government produced no evidence at all—direct or indirect, circumstantial or otherwise—of any connection with interstate commerce. *Leslie*, 103 F.3d at 1102 ("In short, the government did not provide even the slenderest of threads

## B. *Prosecutorial Misconduct*

Elias seeks a reversal of his conviction on the ground that he was prejudiced by improper remarks in the prosecutor's summation.

 "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *accord United States v. Modica*, 663 F.2d 1173, 1184 (2d Cir.1981) ("Reversal is an ill-suited remedy for prosecutorial misconduct....."). To warrant reversal, the prosecutorial misconduct must cause the defendant "substantial prejudice" by " 'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.' " *See United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.' " *Id.* at 78 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

 In assessing whether prosecutorial misconduct caused "substantial prejudice," this Court has adopted a three-part test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Id.*

### 1. *Severity of misconduct.*

 Elias's defense was based on a claim of mistaken identity. Competent counsel therefore argued on summation that, while there were witnesses to the robbery, there was no eyewitness who could make an identification. The prosecutor grossly mis-characterized this argument and said that the defense was thereby insulting the battered victim. This mischaracterization was clearly designed to inflame the passions of the jury and was an improper tactic. *See Modica*, 663 F.2d at 1180 (finding a similar intent to inflame when the prosecutor pleaded with the jury not to let the defendant "walk out of this room laughing at you").

 The government concedes that its remarks were an "inartfully phrased" commentary on "the defense position that, because the robbery victim was unable to identify the robbers due to their disguise and vicious attack, the proof of Elias's guilt was thereby somehow infirm." As we have commented in a previous case, "th[is] explanation strains the meaning of 'inartful.' " *United States v. Melendez*, 57 F.3d 238, 241 (2d Cir.1995). Nevertheless, for two reasons, the circumstances here do not warrant reversal of the conviction.[3]

---

upon which to hang the jurisdictional element of the money-laundering statute."); *Pinckney*, 85 F.3d at 7. Moreover, neither case concerned harm to an enterprise that stocks goods originating out-of-state. Particularly inapposite is *Pinckney*, which concerned a violation of the Anti Car Theft Act, 18 U.S.C. § 2322. The jurisdictional premise of that statute requires the stolen vehicle or vehicle parts to be distributed, sold, or disposed of in interstate or foreign commerce.

**3.** According to Elias, the prosecution committed additional misconduct by stating that Eli-

as's argument evinced desperation, thereby suggesting that the defense was required to prove innocence and was panicked by its inability to do so. We see nothing inherently wrong with characterizing a defense tactic as desperate. *See United States v. Millar*, 79 F.3d 338, 343–44 (2d Cir.1996) (dismissing the argument that the prosecutor's characterization of a defense tactic as "hog wash" and a "smoke screen" conveyed to the jury a fundamental misconception of the role of defense counsel); *United States v. Perry*, 643 F.2d 38, 51 (2d Cir.1981) (finding it "permissible rebuttal" for the prosecutor to charac-

First, this Court has repeatedly stated that the severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding. *See, e.g., Melendez,* 57 F.3d at 241 ("[M]ost of the cases in which we have reversed convictions as a result of prosecutorial misconduct have involved repeated improper statements whose aggregate effect was more likely to undermine the fairness of the trial."); *United States v. Biasucci,* 786 F.2d 504, 514 (2d Cir.1986) ("[A]lthough the prosecutor's disparaging remarks about defense counsel certainly were improper and have no place in any court, they were inconsequential, isolated aberrations in a lengthy trial."); *Modica,* 663 F.2d at 1181 ("The first question is whether the improper comments were minor aberrations in a prolonged trial or cumulative evidence of a proceeding dominated by passion and prejudice.") (internal quotation marks omitted).

The only case relied on by Elias in which the conviction was overturned, *United States v. Friedman,* 909 F.2d 705 (2d Cir.1990), reinforces the view that isolated remarks are ordinarily insufficient. In *Friedman,* the prosecutor (1) repeatedly referred to defense counsel as defendant's witness and to defense counsel's statements as testimony; (2) said that defense counsel would "make any argument he can to get that guy off," and (3) made the following attack:

> [W]hile some people, ladies and gentleman, go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees.

909 F.2d at 707–08. Arguably, each of these improper comments alone is more egregious than the improper remarks made here; certainly, the cumulative impact is substantially greater. In characterizing the prosecutor's statement concerning getting drug dealers off, we stated:

> [T]he prosecutor managed in one breath to undermine the presumption of innocence, the Government's obligation to prove guilt beyond a reasonable doubt, and the standards of propriety applicable to public prosecutors. The jury was invited to conclude that everyone the Government accuses is guilty, that justice is done only when a conviction is obtained, and that defense counsel are impairing this version of justice by having the temerity to provide a defense and to try to "get" the guilty "off."

*Id.* at 709. The reference to "one breath" is not a holding that a single remark, spoken in the space of one prosecutorial exhalation, is enough to impair the integrity of a whole trial. The prosecutor in *Friedman* peppered the summation with aspersions against opposing counsel that were calculated to poison the well by rendering ineffective whatever might be said on defendant's behalf. The improper conduct at issue here is an aberration in an otherwise fair proceeding and does not rise to this level of impropriety.

Second, immediately after defense counsel's argument in summation that there was no eyewitness, defense counsel went on to suggest that Mora was so clearly

---

terize a defense tactic as "desperate" and "struggling"). If there were any doubt about the burden of proof in this case, the prosecutor expressly stated in her rebuttal summation that the burden was on the government and that the government must prove beyond a reasonable doubt each element of the crimes charged. The problem is not that the prosecutor referred to a defense tactic as desperate, but that she mis-characterized defendant's argument in order to make it appear desperate. The use of the word "desperate" is therefore subsumed in the issue raised by the use of the word "insult."

traumatized by the experience that his memory and observations were impaired and therefore the jury could not rely on Mora's belief that he was threatened with a gun. While this may not justify the prosecutor's remarks, it comes closer to an aspersion on the victim of the crime: it is one thing to imply that Mora could not recognize a masked man; it is another to say that he lacked the capacity to know he was targeted by a gun, or beaten with it.

Taken together, these two considerations mitigate the severity of the prosecutor's misconduct.

### 2. The measures adopted to cure the misconduct

In considering the objections raised by defense counsel to the prosecution's rebuttal summation, the district court stated: "I don't find that anything that was said was not a fair comment in response [to the arguments that defense counsel made]." Accordingly, no immediate curative instruction was given. The charge, however, duly advised that "[t]he defendant is presumed innocent until you, the jury, decide unanimously that the government has proven him guilty beyond a reasonable doubt," and that "[c]ertain things are not evidence and are to be disregarded by you in deciding what the facts are. Arguments or statements by the lawyers are not evidence." While such a pattern instruction has been held insufficient in response to specific misconduct by the prosecutor, *see Modica*, 663 F.2d at 1182, the problem here was of lesser severity than in *Modica* and therefore needed less in the way of a cure.

### 3. The certainty of conviction absent the misconduct.

This factor weighs heavily in favor of the government. To prevail, Elias had to show that, absent the isolated impropriety of the prosecutor in rebuttal summation (taken in the context of the entire trial), Elias would not have been convicted. The specific remarks at issue did not touch upon or bolster the most potent of the government's evidence. The government principally relied on Officer Rodriguez's identification and the jailhouse informant's testimony. Therefore, Elias most likely would have been convicted even without the improper remarks.

In sum, although the prosecutor's remarks were improper, they did not result in substantial prejudice to Elias or deprive him of a fair trial.

For the foregoing reasons, we affirm.