UNITED STATES of America

v.

**Mahmoud Reza BANKI, Defendant.**

**No. S1 10 Cr. 08 (JFK).**

United States District Court,
S.D. New York.

July 30, 2010.

Preet Bharara, U.S. Attorney for the Southern District of New York, of Coun-

sel, Anirudh Bansal, E. Danya Perry, for the Government.

Tai H. Park, Eyal Dror, Park & Jensen LLP, Baruch Weiss, Amalia Jorns, Arnold & Porter LLP, for Defendant.

## OPINION AND ORDER

JOHN F. KEENAN, District Judge:

Before the Court is Defendant Mahmoud Reza Banki's ("Banki" or "Defendant") motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. For the reasons that follow, the motion is denied.

## I. Background

In a Superseding Indictment filed March 17, 2010, Banki was charged with: (1) conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions Regulations ("ITR") and to conduct an unlicensed money transmitting business, in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 371; (2) violation of the IEEPA, 50 U.S.C. §§ 1701–1706, and the ITR, 31 C.F.R. Part 560, which prohibit "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran"; and (3) operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, 2. As the conduct underlying these counts, the Indictment charges that

> [t]he transfers in this case did not involve the physical or electronic transmissions of funds between the United States and Iran. Rather, the conspirators operated an informal value transfer system known as a "hawala." In a hawala system, such as the one conducted by [Banki] and his co-conspirators, funds are transferred by customers to a hawala operator, or "hawaladar," in one coun-

try (here, the United States), and then corresponding funds, less any fees, are disbursed to recipients in another country (here, Iran) by foreign hawaladars associated with the U.S.-based hawaladar.

(Indictment ¶ 10). Amongst the overt acts charged, the Indictment specifically referenced a $6,000 transfer Banki received in his Bank of America account on August 10, 2006 and an email Banki sent confirming receipt of such funds. (*Id.* ¶ 18(c)-(d)).

In connection with Counts One, Two, and Three, the Government sought forfeiture of assets including Banki's apartment and funds held in various bank accounts traceable to the $3.4 million transferred to Iran. (*Id.* ¶¶ 27–30).

Additionally, Banki was charged with two counts of making materially false statements in response to inquiries by the Office of Foreign Assets Control ("OFAC") in violation of 18 U.S.C. § 1001(a). As the underlying conduct, the Indictment alleges that Banki told OFAC in writing that: (1) " [t]he payment originally came from one of these family members: "Ali Alaie" who is an Iranian citizen and resides in Tehran, Iran,' whereas, in truth and in fact, the aforementioned payment originated from Banki's father, a United States citizen" (*Id.* ¶ 24); and (2) "all transfers to Banki's [Bank of America] account during the period November 20, 2006 through January 16, 2007 were 'sent by Mr. Ali Alaie to my bank account by wire transfers'; and that Banki had 'not facilitated in any manner payments involving Iran,' whereas, in truth and in fact, the aforementioned payments originated from Banki's father, a United States citizen, and Banki had knowingly facilitated the transfer of funds to Iran from the United States through the use of his [Bank of America] account." (*Id.* ¶ 26).

A jury trial lasting fifteen days over four weeks commenced on May 10, 2010. In its case in chief, in order to establish that Banki knowingly transmitted money to Iran on behalf of others through a hawala, the Government introduced documentary evidence, expert testimony, and the testimony of witnesses who collectively wired hundreds of thousands of dollars from their U.S. bank accounts to Banki's Bank of America account so that, in turn, an equivalent amount of money in Iranian currency would be transferred to their intended beneficiaries in Iran. In response, the defense argued that Banki was simply the recipient of family gifts, and that he had no knowledge that when he received family money from Iran via an Iran-based broker (using various intermediaries), there was a corresponding transfer of money from the United States to Iran.

The central debate at trial centered on whether Banki *knowingly* facilitated the transfer of funds to Iran. The parties vigorously contested the significance of one particularly explicit string of emails involving the August 2006 $6,000 transfer charged as an overt act. The Government introduced an email from Banki's uncle to Banki in which the uncle stated "I told your father that a friend of mine wants to send 6000 USDA to Iran. I asked him to send the money to that account that you gave me before." (Gov't Ex. 100–12). Banki subsequently responded to his uncle, confirming receipt of the $6,000 into his Bank of America account. (Gov't Ex. 100–15). Through this email string, the Government sought to prove that Banki knew that when he received transfers from his family through U.S. intermediaries, corresponding funds were disbursed to recipients in Iran. In an attempt to portray

this as a one-time family favor from which no broader knowledge could be inferred, the defense called Ahmad Sheikholeslami, the originator of the $6,000 transfer, as a witness to explain that in order to circumvent the Iran Trade Embargo, he wired the money to Banki's Bank of America account, and Banki's family in Iran paid out the equivalent of $6,000 in rials to Mr. Sheikholeslami's father-in-law. (Trial Tr. at 990–97).

After approximately four hours of deliberation, on June 4, 2010, the jury returned guilty verdicts against Banki on all five counts. With respect to Count Two (substantive violation of the IEEPA/ITR) and Count Three (substantive violation of operating an unlicensed money transmitting business), the jury found that Banki acted as an aider and abettor. The jury returned on June 7, 2010 to decide the issue of forfeiture. After deliberating for about two hours, the jury found that one of twelve Bank of America accounts was subject to forfeiture as to Counts One, Two, and Three. The jury found the other eleven Bank of America accounts, one Chase Investment account, and two Merrill Lynch accounts not forfeitable, and it could not reach a verdict on the forfeitability of Banki's apartment, one Merrill Lynch account, and a Fidelity Investments account.[1]

Banki subsequently filed the instant motion for a new trial. The basis for his motion rests on two arguments the prosecutor made during rebuttal summation which, in the defense's view, shifted the theories of liability from those charged in the Indictment. The defense candidly acknowledges that substantially all of the arguments in this motion were made and rejected by the Court either prior to or

---

1. Although the jury only deliberated on the issue of forfeiture for a short period of time, at 5:30 p.m., the parties agreed to accept a partial verdict, perhaps because two jurors reported that they could not serve past that day. (Trial Tr. at 1718).

during the course of trial. Evaluating the arguments a second time, even with the benefit of hindsight, I find them no more persuasive.

## II. Discussion

█ Rule 33(a) of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Although Rule 33 gives the trial court broad discretion to set aside a jury verdict, a careful exercise of that discretion is necessary to respect the jury's province as the ultimate finder of fact and credibility; that is, the court will generally avoid supplanting a jury's findings with its own in the absence of "manifest injustice." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992). Therefore, a new trial is warranted only in "exceptional circumstances" where, after evaluating the record evidence and other facts and circumstances, "there [is] a real concern that an innocent person may have been convicted." *United States v. Ferguson*, 246 F.3d 129, 133–34 (2d Cir.2001) (citing *Sanchez*, 969 F.2d at 1414). Defendant bears the burden of demonstrating the necessity of a new trial. *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995).

Defendant argues that he is entitled to a new trial on the hawala counts (Counts One, Two, and Three) because portions of the prosecutor's rebuttal summation: (1) unfairly introduced a new theory of liability; (2) constituted a constructive amendment of the Indictment; and (3) created an impermissible variance from the Indictment. He also requests a new trial as to the false statement counts (Counts Four and Five), similarly arguing that the prosecutor's rebuttal constructively amended the Indictment.

### A. Hawala Counts

With respect to the $6,000 transfer, the Government made the following statements in rebuttal summation:

Now, the defense keeps saying that this email is an outlier, it's different than the other emails. I'm going to get to that in a second, but, ladies and gentlemen, this email by itself, this $6,000 email by itself is enough for you to convict Mr. Banki for conspiring to provide money transmitting services to Iran and for actually providing those money transmitting services to Iran. He knows—there is no doubt from government's 100–12 . . . . There is no doubt, reasonable or otherwise, that Mr. Banki knows that $6,000 U.S. dollars is going to Iran. There is no doubt, reasonable or otherwise, that Mr. Banki facilitates that by sending a confirming email that is asked of him, and he does it in agreement with his father and with Mohammad Taghi Banki, his co-conspirators, and as we all know, the defense has conceded many times that Mr. Banki knew—and we're going to get to the proof of this—but that Mr. Banki knew that there were sanctions against the transfer of funds. That's willfulness: Knowing the law, knowing what's prohibited by the law and doing it anyway. That is willfulness. Listen to the Judge's instructions. This email by itself is enough to convict Mr. Banki on Counts One and Two of the indictment, but it is far from all that you have.

(Trial Tr. at 1570–71). After summations concluded and the jury was dismissed, defense counsel objected to the above-referenced statements in Government's rebuttal. (*Id.* at 1601). I gave counsel the opportunity to fully explain the objection in writing and to suggest an appropriate remedy. The defense argued that the rebuttal summation constituted a prejudicial variance and/or constructive amendment of the Indictment and proposed a supplemental jury instruction to counteract any perceived unfairness. As discussed below,

although I do not find the prosecutor's rebuttal summation to have caused either a constructive amendment or a variance, in an abundance of caution, I gave substantially all of the requested jury instruction. The jury later returned its guilty verdicts.

Defense counsel apparently believed that the jury convicted Defendant solely on the basis of the $6,000 transfer. In the forfeiture summation, defense counsel urged the jury that, if its verdict was driven by the $6,000 transfer, it should only forfeit one master Bank of America account into which the $6,000 was deposited. (*Id.* at 1702–03). The jury forfeited the Bank of America account singled out by defense counsel.

The defense reads the jury's decision to forfeit only one of seventeen Bank of America, Chase, and Merrill Lynch accounts as inescapable proof that the convictions on Counts One, Two, and Three were based solely on the $6,000 transfer. It is important to note that although Defendant had twelve Bank of America account numbers to his name, that fact was not revealed to the jury until after it deliberated and returned its verdicts, when it received the special forfeiture verdict form and an unredacted copy of the Indictment including the forfeiture allegations. It is possible the jury was confused by the sudden revelation of twelve account numbers and decided to forfeit the first-listed, "central" account because defense counsel specifically identified it in summation. It is also possible that the jury was exhausted after a long and hard fought trial and was unwilling to wade through the voluminous exhibits to trace each wire transfer back to the seventeen individual accounts. It is true that defense counsel asked the jury to limit its forfeiture verdict to the account used to effect the $6,000 transfer if it had based its guilty verdict on that transfer, and the jury did forfeit that single account. In my view, however, the defense mistakes correlation for causation.

In any event, this is all speculation, and instead of speculating as to why the jury did not forfeit certain accounts, the proper inquiry should focus on that account the jury *did* forfeit.[2] The forfeited account contains approximately $78,000, an amount which is not in line with either the Government's theory that this was a $3.4 million conviction or the defense theory that this was a $6,000 conviction. Throughout the trial, both parties focused overwhelmingly on this master Bank of America account with which Defendant processed numerous incoming and outgoing transfers charged in the $3.4 million scheme—including, but not limited to, the $6,000 transfer. The jury forfeited that master account. Therefore, the nature of the account as something of a clearinghouse for Iranian transfers and the purposes for which Defendant used it, along with all of the other evidence at trial, considered in conjunction with the supplemental jury instruction about variances, indicate that the jury's decision to forfeit the master Bank of America account was based on its determination that Defendant was guilty of the $3.4 million hawala conduct charged.

---

**2.** The only conclusion that can be drawn from the jury's decision not to forfeit certain accounts is that the Government did not sufficiently establish that the specific property was involved in or represented proceeds traceable to the offenses. This is consistent with the jury's sole function in forfeiture proceedings, which has no bearing on Defendant's guilt. *See* Fed.R.Crim.P. 32.2(b)(1)(A), (b)(5); *see* *also id.* advisory committee notes (2000) ("The provision gives the defendant ... the option of asking that the jury be retained to hear additional evidence regarding the forfeitability of property. The only issue for the jury in such cases would be whether the government has established the requisite nexus between the property and the offense.").

The jury's guilty verdict on Count Three further confirms that it convicted Defendant on more than just the $6,000 transfer. As discussed below, the Government's rebuttal in no way implied that the jury should convict Defendant of operating or facilitating the operation of an unlicensed money transmitting business on the basis of the $6,000 transfer alone. Indeed, no rational jury could have so found that one $6,000 transfer constituted a money transmitting business. In light of the Count Three verdict and all of the evidence at trial, I do not believe that the jury convicted Defendant solely of the $6,000 transfer. There was more than sufficient evidence in the record to support a conviction of the charged $3.4 million hawala conduct. Additionally, the jury was instructed, at the defense's request, that it must acquit Defendant if it found a material variance between the charges in the Indictment and the proof at trial; the jury's guilty verdict indicates that it did not find a material variance, and, accordingly, that it did not convict solely on the basis of the $6,000 transaction. Nevertheless, this decision separately considers any prejudicial effect of the prosecutor's summation.

### 1. The Government's Summation

 In rebuttal summation, the Government "may not use the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial unless defense counsel's remarks assert collateral, exculpatory alibis or defenses which the government would not have been expected to negate previously." *United States v. Rubinson*, 543 F.2d 951, 966 (2d Cir.1976). In evaluating claims of improper summation, the court "must consider the objectionable remarks within the context of the entire trial," *United States v. Espinal*, 981 F.2d 664, 666 (2d Cir.1992), and will grant a new trial only where the improper re-

marks "viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial." *United States v. Pena*, 793 F.2d 486, 490 (2d Cir.1986) (quoting *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.1985)). Therefore, a prosecutor's improper statements during summation require a new trial only where the statements "cause[d] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999) (internal quotations omitted). In determining whether the defendant has suffered substantial prejudice, the court considers: (1) the severity of the misconduct; (2) measures taken to cure the misconduct; and (3) the certainty of conviction absent the misconduct. *United States v. Elias*, 285 F.3d 183, 190 (2d Cir.2002).

I do not find that the Government's statements were improper, as they in no way introduced a new theory of the case. At no point during its case in chief did the Government stray from its allegation that Defendant played a critical role in a hawala that transferred approximately $3.4 million to Iran. For example, among the volumes of documentary evidence introduced, the Government put forth: summary charts listing incoming transfers into Defendant's Bank of America account, which spelled out transfers from approximately 43 different people and business entities, adding up to the $3.4 million charged in the Indictment (Gov't Ex. 500, 501); and numerous emails between Defendant and his father in which the father requested confirmation of receipt of individual wire transfers, offered to prove that Defendant was aware of corresponding payouts in Iran for each of the $3.4 million of transfers he received (*E.g.*, Gov't Ex. 100–20 ("It is very important to answer me right away following fund have set in your account: $100000, $50 000, $35000 (for 50

and 35 I need answer now)")). The Government also called Kouroush Partow, Matt Zangeneh, and Sahra Naderi, who each testified that, in order to get money to Iran, a broker in Iran gave them Defendant's Bank of America account information, they made domestic wire transfers totaling more than $250,000 into Defendant's account, and subsequently recipients in Iran received corresponding amounts of money. (Trial Tr. 198–240).

Of course, the email string regarding the $6,000 transfer was a key piece of evidence, not only because it (coupled with Mr. Sheikholeslami's testimony) effectively constituted an admission that Defendant knowingly facilitated the transfer of $6,000 to Iran, but also because the Government cited it in order to prove Defendant's knowledge with respect to all of the transfers to Iran. In other words, since Defendant sent his family member a confirmation email after the $6,000 Sheikholeslami transfer was deposited in his Bank of America account, after which the family made a corresponding payout in Iran, the Government asked the jury to infer that all of the other emails offered into evidence were similarly confirmations which Defendant knew would trigger $3.4 million in payments in Iran. The Government also emphasized Defendant's apparent lack of surprise that he was being asked to receive the $6,000, and that he sent the confirmation email as directed. (*Id.* at 1572).

There is no question that the Sheikholeslami $6,000 transfer was a central issue in the case. Defendant was well aware that the Government viewed the $6,000 transfer as culpable conduct because it was the basis of two overt acts charged in the Indictment. The defense strenuously contested Defendant's knowledge with respect to all of the money transferred to Iran at trial, and in summation, defense counsel

chose to portray the Sheikholeslami transaction as a "total outlier." (*Id.* at 1550). To that end, defense counsel argued that "[t]he Sheikholeslami transaction doesn't help the government. It completely undermines the government's case." (*Id.* at 1551). It was not improper for the Government to offer a response to defense counsel's somewhat incredible argument that the jury should acquit Defendant on Counts One and Two even though *Defendant essentially admitted an overt act charged in the Indictment.* The Government did not introduce a new theory of liability in its rebuttal summation, it simply countered the defense's summation with a legal argument about the much debated $6,000 transfer. *Accord United States v. Faisal,* 282 Fed.Appx. 849, 851 (2d Cir.2008); *see United States v. Tocco,* 135 F.3d 116, 130 (2d Cir.1998) ("Under the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal."). Most importantly, while the prosecutor emphasized Government Exhibit 100–12, he explicitly told the jury that the $6,000 email string "is far from all that you have" on which to convict Defendant. (Trial Tr. at 1571). As discussed above, there was more than sufficient evidence in the record to support a conviction on the $3.4 million hawala conduct charged in the Indictment.

■ Even if the statements were improper, they were limited in nature and any prejudicial effect was curbed by supplemental jury instructions. The challenged statements constituted only one paragraph of a 35 page rebuttal summation given at the end of four weeks of proceedings in which the Government consistently pursued a conviction for a $3.4 million hawala; this is far from the egregious conduct necessary for a new trial. *See Faisal,* 282 Fed.Appx. at 851; *cf. Eli-*

*as,* 285 F.3d at 191 ("[I]solated remarks are ordinarily insufficient" to warrant reversal on appeal). Furthermore, after defense counsel argued that the prosecutor's rebuttal statements regarding the $6,000 transfer were improper, I entertained written submissions on the objection and requested suggestions for an appropriate remedy. The defense's request for supplemental jury instructions was then granted, and the charge of law included much of the defense proposal.[3] Thus, even if the prosecutor's isolated statements were improper, granting the defense request to charge adequately combated the potential for any prejudice.

Moreover, at no time did the defense move for a mistrial. Although the failure to move for a mistrial is not dispositive, if the defense previously thought a jury instruction was all that was necessary to cure the alleged misconduct, there is no compelling reason why the same statements now warrant a new trial. *See United States v. Melendez,* 57 F.3d 238, 242–43 (2d Cir.1995) ("Although no federal rule of procedure requires a mistrial motion in order to preserve the issue of prosecutorial misconduct for appeal, the absence of such a motion provides some indication that the improper remark was not perceived as rendering the trial unfair and may indicate that defense counsel preferred to have this jury decide [the] client's fate.").

Setting aside the isolated nature of the challenged remarks and the curative jury instruction, it is difficult to seriously credit any of Defendant's arguments that he suffered unfair surprise as a result of the prosecutor's rebuttal summation. Again, the $6,000 transfer was charged in the Indictment and Government Exhibit 100–12 was the subject of extensive questioning and argument in summation by both sides. Any prejudice Defendant suffered would be slight, and the charge of law properly instructed the jury both that the statements of lawyers are not evidence, (Trial Tr. at 1616), and that it should acquit Defendant of the charged conduct if it found there was a material difference between the Indictment and the proof at trial. (*Id.* at 1663–64).

Additionally, there was no "spillover effect" such that the prosecutor's remarks in summation regarding Counts One and Two could have tainted the jury's verdict on Count Three. The prosecutor explicitly limited his arguments about the $6,000 transfer to Counts One and Two. (*Id.* at 1571). He never argued that the jury could convict Defendant of operating an unlicensed money transmitting business solely on the basis of the $6,000, and therefore, there is no improper comment to evaluate. Moreover, as discussed below, no reasonable jury could have found Defendant guilty on Count Three on the basis of the $6,000 transfer, and thus, if the jury somehow could have understood the Government's rebuttal summation as relating to Count Three as well as to Counts One and Two, those remarks would be harmless.

In sum, the Government's rebuttal remarks as to Counts One and Two were proper under the *circumstances,* and even if they were improper, in light of their isolated nature, the Court's curative in-

---

**3.** In accordance with defense's request, the jury that was instructed that:

> The law only requires a substantial similarity between the indictment and the proof. That is sufficient. Thus, if, for example, the indictment charges that a crime was committed in a certain way, or that a certain

amount was involved, and that the testimony or exhibits indicate that, in fact, a different amount was involved, it is for you to decide whether the difference is material, and, if you do find it was material, then you must find the defendant not guilty.

(Trial Tr. at 1664).

struction, and the volume of evidence supporting the $3.4 million theory, Defendant has not established that he suffered any prejudice, much less the substantial prejudice necessary for granting a motion for a new trial.

### 2. Constructive Amendment

 Constructive amendment of an indictment occurs "[w]hen the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir.2005) (internal quotation omitted); *see United States v. Frank*, 156 F.3d 332, 337 (2d Cir.1998). Although the Fifth Amendment protects a criminal defendant's right to be tried only for crimes indicted by a grand jury, that right is preserved so long as the defendant has notice of the "core of criminality" charged and the proof at trial is substantially similar to the charges. *See United States v. Patino*, 962 F.2d 263, 266 (2d Cir.1992) (noting that the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial"); *see also United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999). Therefore, " '[w]here charges are constructively narrowed or where a generally framed indictment encompasses the specific legal theory or evidence used at trial' there is no constructive amendment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir.2003) (quoting *United States v. Wallace*, 59 F.3d 333, 337 (2d Cir.1995)).

 Both the evidence at trial and the jury charge were predicated on and conformed to the $3.4 million conduct charged in the Indictment. The defense cites no case law in support of the proposition that a one paragraph argument in summation which concerned the law, not the contested evidence at trial, can act to constructively amend an indictment. I assume without deciding that a rebuttal argument could theoretically overwhelm the proof at trial and modify the original bases for conviction laid out in a charging document. However, that theoretical situation did not arise in this case. The problem with Defendant's argument regarding the challenged rebuttal statements of course is that the $6,000 transfer was charged as an overt act in the Indictment; therefore, the defense has an uphill battle in demonstrating how the prosecutor's rebuttal statements permitted the jury to convict on the basis of conduct beyond that charged in the grand jury's indictment. The rebuttal certainly did not add a new theory of guilt to the case; at worst, the prosecutor's statements constituted a constitutionally permissible narrowing of the charges within the stated core of criminality, that is, the willful provision of services to Iran. *See Salmonese*, 352 F.3d at 620; *United States v. Morgenstern*, 933 F.2d 1108, 1115 (2d Cir.1991).

Defendant contends that the Indictment only covers transfers that were conducted in exchange for a fee, whereas the $6,000 transaction was a favor for which Defendant did not charge a fee. First, the Indictment does not specify that each transfer effected through the hawala definitively included a fee, only that it may have or potentially involved a fee. (Indictment ¶ 10) ("funds are transferred by customers to a hawala operator, or 'hawaladar,' in one country (here, the United States), and then corresponding funds, less *any* fees, are disbursed to recipients in another country (here, Iran)") (emphasis added). Moreover, in light of the variety of reasons a person may be motivated to provide services to Iran, as discussed below, I held as a matter of law that the IEEPA is not limited to regulating fee-based activity. Consistent with the law and these charges,

Dr. Matthew Levitt testified that while hawalas can involve fees, a hawaladar may receive other economic benefits from the provision of money transfer services, for example, "the benefit of being able to move money of his own or of a business partner or a family member to the United States" from Iran for investment purposes or to pay personal expenses. (Trial Tr. at 515, 529). Although Defendant may not have charged Mr. Sheikholeslami for facilitating the transfer, he did receive the benefit of $6,000 in his Bank of America account to spend or invest as he pleased. Therefore, the prosecutor's rebuttal summation addressed evidence that falls squarely within the charges of the Indictment and does not constitute a constructive amendment.

### 3. Variance

 As a corollary to the constructive amendment argument, Defendant argues that the prosecutor's rebuttal summation created a prejudicial variance between the charging document and the Government's theory of the case. While "[a]n *amendment* of the indictment occurs when the charging terms of the indictment are altered, . . . a *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Weiss,* 752 F.2d 777, 787 (2d Cir.1985) (internal quotations omitted). Although the Government is not required to prove, for example, every penny of an amount charged in the indictment, the law requires a "substantial similarity" between the indictment and the proof at trial in order to convict. *Morgenstern,* 933 F.2d at 1115. As a variance does not broaden the bases for conviction beyond the grand jury's indictment, a defendant must demonstrate that he suffered "substantial prejudice" in order to obtain relief. *Weiss,* 752

F.2d at 790. A variance does not rise to the level of substantial prejudice "where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *United States v. Mucciante,* 21 F.3d 1228, 1236 (2d Cir.1994).

Again, the defense cites no cases for the proposition that a one paragraph legal argument in a rebuttal summation, as opposed to the proof at trial, can amount to a variance; however, I assume without deciding that it is possible. Nevertheless, the $6,000 transfer is explicitly charged as one of several overt acts in Count One of the Indictment. The proof at trial sought to establish all of those overt acts and fully conformed to the Government's $3.4 million theory of liability. The argument that the jury could convict Defendant on Count One, the conspiracy count, on the basis of one of the charged overt acts was neither a new or legally deficient theory. While Count Two incorporates the $3.4 million conspiracy allegation in paragraph 8 of the Indictment, it does not incorporate the $6,000 overt act, and it simply alleges that Defendant "unlawfully, willfully, and knowingly conducted financial transactions" in violation of the IEEPA and ITR by providing money transferring services to people in Iran. (Indictment ¶ 20). There is no specific amount of money referenced in connection with the substantive IEEPA/ITR violation, and thus the Government's argument regarding the $6,000 transfer did not necessarily create any variance from the Indictment.

If a variance did occur, it did not cause the Defendant substantial prejudice. Defendant claims that had he known the Government would argue that he was guilty

based only on the $6,000 transaction, he might have required the Government to prove up the transaction instead of calling Mr. Sheikholeslami as a witness and he "might have concluded it was worth taking the stand." (Br. at 26). However, the defense extensively disputed the relevance of the $6,000 transfer email string both in cross-examination and in summation. It is unclear to me what additional challenges defense counsel could have mounted had it known about the rebuttal statements in advance. Most importantly, Mr. Sheikholeslami's brief testimony—which was not subjected to cross-examination and only offered to explain the singular nature of the $6,000 transaction—did no more damage to Defendant than the email string in Government Exhibit 100–12, which was, as previously noted, quite explicit. Furthermore, as the $6,000 transfer email string was a key piece of evidence in the Government's case from the very beginning of trial, a piece of evidence that defense counsel vigorously challenged, there is no reason why the prosecutor's summation could have made Defendant's testimony more important than it would have otherwise been.

Finally, any prejudice that might have occurred was cured by the supplemental jury instruction, given at Defendant's request, that the jury should acquit if it found a material difference between the proof at trial and the charges in the Indictment. I presume that the jury followed instructions, and therefore must conclude that the guilty verdict indicates that the prosecutor's summation did not affect the proceedings and the jury found no material variance. Thus, Defendant has not established substantial prejudice caused by a variance in the proof at trial and the Indictment.

### 4. Jury Instructions

Defendant further argues that he was prejudiced by the Court's failure to give certain jury instructions in light of the Government's "new" $6,000 theory of the case. However, the requests to charge were denied because they are incorrect as a matter of law or the subject of common knowledge, regardless of whether the Indictment charged and the Government argued liability premised on a $6,000 or $3.4 million hawala. Therefore, even if the Government had improperly shifted its theory of the case—and I do not so find—the jury instructions would not have changed.

### a. Fees

■ Defendant argues that the charge of law should have instructed the jury that in order to be guilty of an IEEPA violation, Defendant must have provided a service to Iran for a fee. He claims that the failure to give the requested instruction prejudiced him because it allowed the jury to convict based on a transaction for which no one received a fee.

The facts of this case do not warrant such an instruction. Under his reading of the statute, Defendant's knowing and willful facilitation of the transfer of $6,000 on behalf of Mr. Sheikholeslami from the United States to Iran, executed in such a way as to avoid the sanctions against Iran, would be lawful because he claimed that it was an act of generosity and friendship. In my mind, this is a dictionary definition of a service—an act of assistance for another. And although Defendant did not charge for this service, he certainly received the financial benefit of cash in his Bank of America account for his personal use. It is not the motivation behind the transaction that the IEEPA intends to regulate, but the transaction itself.

Nor is there any legal authority mandating that I accept Defendant's overly limited interpretation of the IEEPA's prohibition on the provision of services. In

*United States v. Homa International Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004), the Court of Appeals held that "the execution on behalf of others of money transfers from the United States to Iran is a 'service' under the terms of the Embargo. The term 'services' is unambiguous and refers to the performance of something useful for a fee." However, the *Homa* Court affirmed an IEEPA conviction in a trial in which Judge Griesa did not explicitly instruct the jury about fees, so I read *Homa*, in light of its particular facts, not as case law introducing the receipt of fees as an element of the IEEPA offense, but as general guidance on the law. The *Homa* Court did not intend to restrict the application of the IEEPA such that money transferring services a defendant provides for financial gain other than fees would be permissible despite the Embargo. There is no basis for the proposition that Congress intended to exempt this type of service from the Iranian trade sanctions. Therefore, regardless of the theory pursued by the Government, the jury would not have been instructed that it must acquit Defendant unless the Government proved he received fees in exchange for his services.

### b. Money Transmitting Business

Defendant also challenges the jury instruction with respect to Count Three, arguing that the money transmitting business count must contain a fee element and must consist of more than one transaction. I note again that the Government's challenged rebuttal summation never referenced Count Three, thus there was no prejudice to be compounded by the jury instruction on this subject. Nevertheless, there was no error in the instruction. A business is not a complex or legal concept. No juror needs a judge's charge of law to comprehend that a "business" is an ongoing enterprise carried out for financial

gain; there is no other interpretation of the term "business" the jury could have possibly applied. *See United States v. Velastegui*, 199 F.3d 590, 595 n. 4 (2d Cir. 1999) ("[S]ection 1960(a) requires that the unlicensed entity be 'an illegal money transmitting *business*' (emphasis added) which insures that persons or entities cannot be prosecuted for a single, isolated transmission of money."). The jury was charged on Congress' statutory definition of a money transmitting business (Trial Tr. at 1650); I saw no more need than Congress did to expound on the definition of a business. Moreover, the jury was instructed, at the defense's request, that in considering the question of Defendant's guilt on Count Three, it should determine "whether the quantity and nature of the transmittals constitute a business." (Trial Tr. at 1650). Implicit in that statement was an instruction that a business involves more than one transaction.

It is not reasonable to assume that the absence of a definition for an everyday concept that has a plain, commonly understood meaning allowed the jury to reach a patently illogical verdict. No rational jury could have convicted Defendant of operating or facilitating the operation of a money transmitting business on the basis of the $6,000 Sheikholeslami transaction alone, and indeed, the Government never argued that it could. Instead, a more reasonable conclusion to be drawn is that the jury found Defendant guilty of facilitating the operation of an Iranian money transmitting business on the basis of the numerous confirmation emails he sent to his co-conspirators to trigger payouts in Iran. Therefore, the jury instruction did not permit the jury to convict Defendant on Count Three for a single transfer.

### c. Aiding and Abetting

The defense again objects to the aiding and abetting jury instruction given at trial,

arguing the jury should have received a "purposeful intent" instruction specifying that an aider and abettor must desire to bring about the outcome of the criminal venture, rather than simply know of that outcome. In fact, the jury was given the standard aiding and abetting instruction, straight out of Sand and Siffert—an instruction which encompasses the defense request to charge. In defining aiding and abetting for the jury, they were charged as follows:

> In order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associate himself in some way with the crime, and that he willfully and knowingly seek by some act to help make the crime succeed.... The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. *An aider and abettor must have some interest in the criminal venture.* To determine whether the defendant aided or abetted the commission of the crimes with which he is charged in Counts Two and Three, ask yourself these questions: *Did he participate in the crime charged as something he wished to bring about?* Did he associate himself with the criminal venture knowingly and willfully? *Did he seek by his actions to make the criminal venture succeed?* If he did, then the defendant is an aider and abettor, and therefore guilty of the offenses. If he did not, then the defendant is not an aider and abettor, and is not guilty of these crimes.

(Trial Tr. at 1655–56) (emphasis added). In sum and substance, the jury was instructed as the defense requested.

#### d. Customer/Beneficiary

Defendant cites to a series of cases involving small narcotics sales in support of the proposition that the jury should have been charged that a "mere customer or beneficiary" of a hawala or money transmitting business: (1) is not liable as an aider and abettor without additional evidence; and (2) is not liable for conspiracy.

With respect to aiding and abetting, factually, there is no way the jury could have found that Defendant was merely a customer or beneficiary in the $6,000 Sheikholeslami transaction, and thus no instruction was necessary to counteract the alleged prejudice caused by the rebuttal summation. Defendant did not solicit a service from Mr. Sheikholeslami or his uncle; they sought out Defendant knowing that he had a U.S. bank account and connections in Iran, and requested his help with the $6,000 transfer. If the customer/beneficiary instruction applied in this context at all, it would apply to Mr. Sheikholeslami, not to Defendant; no Mr. Sheikholeslami, no $6,000 to be sent to Iran. Whatever facilitation exception *Abuelhawa v. United States*, —— U.S. ——, 129 S.Ct. 2102, 2105, 173 L.Ed.2d 982 (2009), recognized, even if I were to extend it beyond the Controlled Substances Act context, would not apply to Defendant.

Nor was the requested customer or beneficiary charge relevant to the conspiracy count. The buyer-seller exception Defendant refers to narrowly applies to federal narcotics conspiracy law. Even if I were to accept Defendant's position that the buyer-seller exception applies broadly to any conspiracy, the Court of Appeals has determined that "the seller cannot be considered to have joined a conspiracy with the buyer to advance the buyer's resale unless the seller somehow encouraged the venture or has a stake in it—an interest in

bringing about its success." *United States v. Parker*, 554 F.3d 230, 235–36 (2d Cir. 2009). The jury was instructed both with respect to conspiracy and aiding and abetting that in order to find Defendant guilty, he must have participated with the intent of bringing about the intended unlawful objective. (Trial Tr. at 1642 ("In sum, the defendant, with an understanding of the unlawful nature of the conspiracy, must intentionally have engaged, advised or assisted in it for the purpose of furthering the illegal undertaking."); *Id.* at 1654–56 ("To determine whether the defendant aided or abetted the commission of the crimes with which he is charged in Counts Two and Three, ask yourself these questions: ... Did he seek by his actions to make the criminal venture succeed?")). The jury convicted Defendant not only on Count One, but also on Counts Two and Three as an aider and abettor, necessarily finding that he wished to bring about those crimes and sought to make the criminal venture succeed. This is exactly the finding which, under *Parker*, makes the buyer-seller exception inapplicable, and thus, any deficiency in the jury instruction would be harmless.

### e. Family Remittances

■ The defense challenges the decision not to charge the jury on the subject of the so-called family remittance exception to the Iran Trade Embargo. Prior to trial, the defense submitted extensive briefing in support of its request that the Court give an instruction to the effect that the ITR do not prohibit the non-commercial transfers of funds among family members in the United States and Iran, and that the jury could acquit Defendant on Counts One and Two if it found that the money transfers in question were family remittances. However, the ITR are quite clear that "*United States depository institutions* are authorized to process transfers of funds to or from Iran ... if the transfer ... arises from an underlying transaction that is not prohibited by this part, such as a non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise)." 31 C.F.R. § 560.516(a)(2) (emphasis added); *see United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01 Civ. 2091, 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003) (declining to apply family remittance exception to currency exchange because "this exemption only applies to transfers of family remittances made by a 'United States depository institution' .... The plain meaning of this language (as well as its evident purpose to limit family remittance transfers to those bank-like entities regularly subject to U.S. oversight and regulation) does not reach a currency exchange facility"). There is no serious contention that Defendant is a depository institution, and indeed there was no evidence to establish anything close to this at trial. In light of the plain language of the regulations, I declined as a matter of law to broaden the reach of the family remittance exception beyond its application to United States depository institutions. Even assuming the defense's contention that Banki accepted $6,000 from Mr. Sheikholeslami as a one-time transaction done as a favor to a family friend, no jury could find that in facilitating the transfer to Iran, Defendant was acting as a United States depository institution. As such, the requested jury instruction was unwarranted, and the decision not to give such instruction caused no prejudice to Defendant.

### B. False Statement Counts

#### 1. Constructive Amendment

■ Defendant additionally challenges a separate paragraph in the prosecutor's rebuttal summation as constructively

amending the Indictment by introducing a new theory of liability—that is, when Defendant told OFAC that he received money from his cousin Ali Alaie (an Iranian citizen), those statements were untrue because the actual source of the money transfers from Iran was his uncle (an Iranian citizen), whereas the Indictment specifies that the money came from his father (an American citizen). Specifically, the Government argued:

Now, where in all of the defense case is Ali Alaie? The defense spent all this time trying to establish that the money came from [Mohammad] Reza Alaie. . . . But the defense has conceded, and their own witness has conceded, that Ali Alaie had no role in transferring this money. So, what the defendant said to OFAC was false. Mr. Park wants you to throw that out, to not care about that because it is not material he says. He says it doesn't matter, that lie doesn't matter. Remember, the uncle [Mohammad] Alaie was the subject of an OFAC investigation.

(Trial Tr. at 1597–98). Defense counsel objected to the reference to the OFAC investigation, and the objection was sustained. The prosecutor continued: "Listen to the judge's instructions, ladies and gentlemen. A lie only has to be capable of influencing an agency decision. Do you think throwing somebody, throwing an OFAC investigator off the scent of a potential subject of an investigation is not material?" (*Id.* at 1598). Defense counsel again objected to what it termed a mischaracterization of the evidence. This objection was overruled, but the jury was instructed that its "recollection of the testimony and of the evidence is what controls, not the lawyers', not mine." (*Id.* at 1598).

The Indictment specifies that Defendant made false statements to OFAC, and that those statements were false because the money came from his father, not from his cousin. The Government is bound by the terms of the Indictment as to which statements were false and why they were false. However, the law also requires that a false statement be material; the Indictment generally alleges that the false statements were material, but it does not specify the reason why the false statements were material. Instead, the Government established materiality with the testimony of OFAC investigator Stephanie Rice, who stated that the citizenship of the person transmitting money to Defendant was important due to the limits of OFAC's jurisdiction (Trial Tr. at 624), and that the specific identity of the person actually transmitting money to Defendant was material where that person had previously been the subject of an OFAC investigation (*Id.* at 654).

Although Ms. Rice testified as to two potential theories of materiality, the Government primarily pursued materiality based on citizenship by establishing that the money transfers came from Defendant's father. The Government introduced many emails in which Defendant's father represented that he would send his son money. (*E.g.,* Gov't Exs. 100–27/100–36, 100–54). In its opening summation, the Government referenced these emails in support of its argument on Counts Four and Five that "It's the father's money. Over and over the father says I will transfer, I will do this, and the defendant says to the father can you transfer." (Trial Tr. at 1471). Indeed, one sentence prior to the challenged paragraph of rebuttal summation, the Government unequivocally stated that "[t]he only evidence that there is, the only thing that's not conjecture or speculation, is that this is the father's money and that the defendant lied when he said that it was not and when he said that it was Ali Alaie's money." (*Id.* at 1597). At no point in time did the Government stray from the charges as stated in Counts

Four and Five of the Indictment, nor is there any real concern here that Defendant was convicted of a charge the grand jury did not make against him.

This isolated rebuttal argument—was nothing more than a fair response to defense counsel's statement in summation that "it wasn't the cousin. There's no evidence it was the cousin. Understood. But even by the government's own theory, they would agree with us that if it's the cousin versus the uncle, it doesn't matter, it's immaterial." (*Id.* at 1559). The summation argument did not introduce a new theory of materiality beyond the Indictment, it simply referenced Ms. Rice's testimony to rebut defense counsel's assertion that the parties would agree about the materiality of the uncle's identity. Furthermore, the rebuttal statements did not alter the core of criminality charged in Counts Four and Five, namely that Defendant lied to OFAC about the source of transfers from Iran.

Even if the prosecutor's brief remarks could be considered a new theory of materiality, they did not broaden the bases of conviction beyond the terms of the Indictment. The generally framed Indictment does not limit the Government to the theory of materiality premised on citizenship that it pursued at trial. *See Wallace,* 59 F.3d at 337 (no constructive amendment "where a generally framed indictment encompasses the specific legal theory or evidence used at trial"). Thus, the prosecutor's rebuttal summation does not warrant the drastic remedy of a new trial.

### III. Conclusion

The Rule 33 motion for a new trial is denied. Sentencing will proceed as scheduled on August 16, 2010 at 11:30 a.m. **SO ORDERED.**